GUIDRY, J.
|2A truck driver appeals the allocation of fault and general damages awards rendered by the trial court pursuant to a jury verdict for an accident in which the trailer of his 18-wheeler collided with an overhanging tree limb while traveling down a state highway. The State of Louisiana, through the Department of Transportation and Development (DOTD), separately appeals the trial court’s judgment finding it liable and the jury’s award of special damages.
FACTS AND PROCEDURAL HISTORY
Around 1:00 p.m. on November 10, 2000, Michael Brown was driving an 18-wheeler for Triad Transport, Inc. on Louisiana Highway 21, known as St. John Street, in Madisonville, Louisiana. About five minutes from his destination, as he was preparing to navigate a sharp curve in the road, the trailer of the truck collided with a tree limb that hung over the lane in which Mr. Brown was traveling. A few weeks prior to the accident, in August 2000, the DOTD had completed a road maintenance project along that stretch of Louisiana Highway 21 that included overlaying the roadway.
The collision with the tree limb damaged the roof of the trailer of the truck, but did not damage or cause a spill of the hazardous materials Mr. Brown was transporting in the truck at the time. Mr. Brown reported the incident to his dispatcher, and on receiving instructions from his supervisor, proceeded to his destination where he waited for a replacement trailer to which to transfer the load of hazardous materials he was transporting.
Although he did not seek immediate medical attention following the accident, within days of the incident, Mr. Brown notified his supervisor and dispatcher that he was experiencing some pain. He visited the emergency room of a local hospital to seek treatment two weeks following the accident, but after waiting for a few hours, he left the hospital without being treated. A few days | 3later, Mr. Brown again sought medical treatment, and was prescribed various anti inflammatory and pain medication and conservative therapy for his pain. Despite his pain, Mr. Brown continued to work as an over-the-road truck driver during this time.
By mid-December 2000, Mr. Brown’s pain had not abated, but had grown worse. The medical treatment that he had received did not improve his symptoms, and Mr. Brown sought more specialized and invasive medical treatment for his injuries. Due to his pain and the potency of the medication he was taking, Mr. Brown stopped working.
On November 9, 2001, Mr. Brown filed a petition for damages against the City of Madisonville, Covington Paving Company (identified in the petition as “Covington Paving”), and Weldon Wallace Poole (identified as “Wallace Poole” in the petition), generally alleging that the named defendants were liable for failing to properly maintain the roadway to eliminate the danger presented or to warn of the danger. In the petition, Mr. Brown asserted that prior to the accident, the roadway was resurfaced “and this actually raised the height of the roadway, causing the tree limb to be below a safe height at which vehicles could pass without striking the limb.” Mr. Brown later amended his petition to add the DOTD as a defendant.
*879 Mr. Brown’s claims against the City of Madisonville and Mr. Poole were later dismissed pursuant to summary judgments granted in favor of those defendants. Mr. Brown also filed a motion for partial dismissal, to dismiss without prejudice the claims asserted against Covington Paving Company, which was granted by the trial court. Mr. Brown then filed a motion for summary judgment against the remaining defendant, the DOTD, which the trial court denied in open court at the hearing on the motion.
Thus, the matter was set to proceed to trial. On the eve of trial, the DOTD filed a motion in limine to exclude the testimony of an economics expert whose | testimony Mr. Brown proposed to present to the jury. A four-day trial on the merits began on December 4, 2006. On the third day of trial, prior to the presentation of the testimony of Mr. Brown’s economics expert, the trial court considered the motion in limine filed by the DOTD and denied the motion. Thereafter, the parties continued presentation of evidence and argument to the jury, following which the jury ruled in favor of Mr. Brown, awarding the following damages, subject to reduction in accordance with the jury’s allocation of sixty-one percent fault to Mr. Brown and thirty-nine percent fault to the DOTD:
Past physical pain and suffering $ 10,000
Future physical pain and suffering $ 40,000
Past mental pain and suffering $ 6,000
Future mental pain and suffering $ 12,000
Past medical expenses $186,453
Future medical expenses $614,503
Past loss of wages $179,736
Loss of future wages and/or earning capacity $446,971
Loss of enjoyment of life $ 10,000
The trial court rendered judgment in accordance with the jury’s verdict, and following the denial of various post-trial motions filed by the parties, the trial court granted Mr. Brown a devolutive appeal and the DOTD a suspensive appeal from the judgment. Consideration of those cross appeals is discussed herein.
ASSIGNMENTS OF ERROR
By this appeal, Mr. Brown seeks to modify the judgment in the following respects:
1.The jury erred in assessing 61% comparative fault to the plaintiff, where there is no evidence or testimony supporting any fault on the plaintiff.
| ñ2. The jury erred when it awarded only $10,000.00 dollars in past pain and suffering for injuries that had necessitated undergoing $186,453.00 in invasive medical treatment for chronic pain for a period of over six years.
3. It was error to award only $40,000.00 in future physical pain and suffering when the jury agreed that plaintiff had injuries that would require $614,503 in future medical care to try and control the pain.[1]
The DOTD filed a separate, suspensive appeal of the judgment, alleging the following assignments of error:
1. The trial court erred in denying the State’s Daubert motion seeking to deny qualification to plaintiffs expert in economics and statistics, where the expert used methods of calculation [not] accepted in the industry.
2. The jury erred/abused its discretion in finding 39% liability on the part of the State, when it should have assessed 100% liability to plaintiff.
3. The jury erred/abused its discretion in awarding plaintiff past lost wages in the amount of $179,736.00, which *880 was based entirely on only his wages for his last six months of employment, and did not include the average of his prior earnings for the past five years.
4. The jury erred/abused its discretion in awarding plaintiff future lost wages in the amount of $446,971.00 which was based entirely on only his wages for his last six months of employment, and did not include the average of his prior earnings for the past five years.
5. The jury erred/abused its discretion in awarding damages to plaintiff where plaintiff failed to prove causation of his injuries.
6. The jury erred/abused its discretion in awarding plaintiff future medical expenses at all, and specifically in awarding an amount of $614,503.00, which was based on sheer speculation, where no physician testified that plaintiff would need any items medically more probable than not[.]
DISCUSSION

Motion in Limine

In its first assignment of error, the DOTD contends that the trial court erred in denying its motion in limine to exclude the testimony of Dr. Charles Bettinger based on a Daubert objection. DOTD alleges that Dr. Bettinger’s method of 1 ^calculation was “radical and resulted in radically inflated figures for past and future lost wages.” Dr. Bettinger was offered by Mr. Brown and accepted by the trial court as an expert in economics.
In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the U.S. Supreme Court articulated the standard for courts to follow in determining the admissibility of expert scientific testimony under Federal Rule of Evidence article 702.[2] In that opinion, the court enumerated certain factors for courts to consider in evaluating the admissibility of expert scientific testimony, including testing, peer review, error rates, and acceptability in the relevant scientific community. Daubert, 509 U.S. at 593-594, 113 S.Ct. at 2796-2797.
When confusion arose over whether the Daubert test applied to non-scientifie, expert testimony, the U.S. Supreme Court held ‘Daubert’s general holding — setting forth the trial judge’s general ‘gatekeep-ing’ obligation — applies not only to testimony based on ‘scientific’ knowledge, but also to testimony based on ‘technical’ and ‘other specialized’ knowledge.’ ” Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999). Thus, the Court held that “as ... stated in Daubert, the test of reliability is ‘flexible,’ and Daubert’s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.” Kumho Tire Company, Ltd., 526 U.S. at 141-142, 119 S.Ct. at 1171 (emphasis in original).
Accordingly, the factual basis for an expert opinion determines the credibility of the testimony. It is the responsibility of opposing counsel to explore |7the factual basis for the opinion and thus, determine its reliability. An unsupported opinion can offer no assistance to the fact *881 finder, and should not be admitted as expert testimony. Miramon v. Bradley, 96-1872, p. 6 (La.App. 1st Cir.9/23/97), 701 So.2d 475, 478. The trial court’s inquiry must be tied to the specific facts of the particular case. The abuse of discretion standard applies to the trial court’s ultimate conclusion as to whether to exclude expert witness testimony and to the trial court’s decisions as to how to determine reliability. Ashy v. Trotter, 04-612, pp. 18-19 (La.App. 3d Cir.11/10/04), 888 So.2d 344, 356, writs denied, 05-0180, 05-0347 (La.3/24/05), 896 So.2d 1045, 1047. Furthermore, when opinions of expert witnesses differ, it is for the trier of fact to determine the most credible evidence and these determinations will not be overturned unless it is proven that the expert’s stated reasons are patently unsound. Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201, pp. 6-7 (La.10/19/99), 748 So.2d 417, 421.
Herein, DOTD contends that the reasoning and methodology used by Dr. Bettinger was patently unsound because Dr. Bettinger calculated the amount of past and future lost wages Mr. Brown had and would incur based on his earnings as a company truck driver only, excluding earnings from the periods in which Mr. Brown was employed as an independent or owner-operator truck driver.
At trial, Mr. Brown provided his income tax returns and W-2 wage and tax statements for the years 1996 through 2000. The video deposition testimony of Mr. Brown’s supervisors from trucking companies where he used to work, including his direct supervisor and his dispatcher at Triad Transport, Inc., were also introduced. Mr. Brown’s supervisors all testified that Mr. Brown was an excellent driver and a hardworker. Mr. Brown’s supervisor at Triad Transport, Inc., Mark Wilkett, additionally testified that in the year 2000, truck drivers with Triad Transport, Inc. were making anywhere from $46,000 to $48,000, and truck |sdrivers like Mr. Brown, who worked out of the Houston terminal, were making in the high $40,000 to low $50,000. At the time he was deposed, Mr. Wilkett testified that truck drivers with his company were earning in the low $50,000 range on average.
When asked at trial whether he preferred working independently as an owner-operator truck driver or as a company driver, Mr. Brown testified, “I tried that self-employment, but I found that Triad, you know, they give me a lot of relief and take the burden off of your shoulders. So I would rather be a company driver.” Mr. Brown described some of the problems he encountered as an owner-operator by relating his experience while working with a particular company, Cryogenic Transportation, Inc. He stated that while working with that company, he worked as an operator who was allowed to lease the trucks he drove from the company and he stated that he made good money; however, he further stated, “[y]ou’ve got to have some truck knowledge on your trucks, you know, because you can make good money and, within a month’s time, you end up owing the company money. So I made good money. I was saving money for my son and everything, you know, but I had a lot of expense.” Mr. Brown testified that in the end, he stopped working for Cryogenic Transportation, Inc. “because it was too much overhead.”
At the time of his accident, Mr. Brown was 44 years old. He testified that prior to the accident, it was his intent to work until he reached the age of 65 because he had a young son. At the time of the trial, Mr. Brown’s son was seven years old.
In formulating his opinion regarding Mr. Brown’s past lost wages and loss of future *882 earnings capacity, Dr. Bettinger testified that he considered Mr. Brown’s age, the date of the accident, his training and skills, including the fact that Mr. Brown was Hazmat certified, his experience, and the type of work Mr. Brown performed. Based on Mr. Brown’s tax returns and Mr. Brown’s testimony, Dr. | nBettinger decided that the best way to determine Mr. Brown’s past and future lost wages was to consider only his earnings as a company driver. As Dr. Bettinger explained:
He had a — obviously from the tax returns, he had problems with expenses, just running away expenses while ... his truck was down, which ... if you’re an owner-operator and your truck is not running, your expenses skyrocket and your income stops. So he did not have a great success as an owner-operator....
But ... the final choice, was to go to work as a company driver. The difference between a company driver and owner-operator is the fact that he is told where to go. He is told when to go. What to pick up. Where to drop it off. And he gets a regular amount of money for doing those kinds of jobs. He doesn’t have to worry about his truck being broken down. If he has a breakdown, the company sends another truck out. They shift all the materials around and he keeps on driving.
On the other hand, we tend to think of owner-operator[s] having more income potential, but this depends on how good a business person they are. I can’t speak except that it doesn’t look like he was a very good business person as an owner-operator or maybe he had a bad truck. But either one of those are deadly if you’re an owner-operator. So his primary earning capacity was not as an owner-operator but as a company driver, which is what he was doing at the time of the injury.
The reasons expressed by Dr. Bettinger are logical, reasonable, and supported by the evidence. Thus, we cannot say that the trial court abused its discretion in allowing Dr. Bettinger to testify regarding his calculations of Mr. Brown’s lost wages, past and future.

LIABILITY OF DOTD

In its second assignment of error, DOTD alleges that the jury erred in assessing it with any fault relative to Mr. Brown’s collision with the tree. Normally, when liability is premised on DOTD’s ownership of an allegedly defective thing, a plaintiff may recover damages from DOTD, a public entity, based on La. C.C. art. 2317, as limited by La. R.S. 9:2800. However, as liability in this case is premised on a tree that is located outside of the area of DOTD’s right-of-way, simple negligence principles apply to determine DOTD’s liability as outlined by this court in Murphree v. Daigle, 02-1935, pp. 3-1 (La.App. 1st Cir (9/26/03), 857 So.2d 535, 537-538, writ denied, 03-2927 (La.1/9/04), 862 So.2d 990 (case citations omitted):
When trees are outside the right-of-way, they are outside the ownership or “garde” of the entity charged with maintaining the highway. Accordingly, strict liability under Louisiana Civil Code article 2317 is inapplicable and simple negligence principles apply. See also [La.] C.C. art 2317.1. Under those principles, to establish a breach of DOTD’s duty to maintain safety for the motoring public, a plaintiff must show that a hazardous condition existed and that DOTD had actual or constructive knowledge of said condition, but failed to take corrective action within a reasonable time. “Constructive notice” in negligence cases exists when the defect or condition has existed for such a period of time that it would have been discovered and re *883 paired had the public body exercised reasonable care.
The ultimate determination of whether a condition creates an unreasonable risk of harm is subject to review on appeal under the manifest error standard. Under this standard, the trial court’s findings are reversible only when there is no reasonable factual basis for the conclusions, or if they are clearly wrong. Similarly, the question of whether or not DOTD had actual or constructive notice of a hazardous condition creating a risk for motorists is a factual issue and is reviewed under the manifest error standard. On the other hand, the existence of a duty is an issue of law [that] is determined by the court. On this issue, the inquiry is whether the plaintiff has any law-statutory, jurisprudential, or arising from general principles of fault — to support his claim.
At trial, the parties agreed to the following stipulations:
1. On November 10, 2000 Michael Brown was driving a 1999 Peterbilt eighteen wheeler in the city of Madi-sonville when his trailer struck a tree limb that was hanging over the roadway.
2. The highway he was traveling on when the accident occurred was Highway 21 which is a State highway that is under the care, custody and maintenance of the State of Louisiana.
3. The particular stretch of highway is designated as St. John Street.
4. The State DOTD had undertaken a road project on January 8, 2000 and it was completed on August 16, 2000.
Several witnesses, including local residents, a former Madisonville police officer, and DOTD road maintenance employees, testified that prior to the November 10, 2000 accident, they observed the tree limb at issue scrape the tops of trucks, often shearing small branches and leaves off the limb, as the trucks drove on Louisiana Highway 21 under the overhanging limb. Frank M. Burns, Jr., who lived in a In house near the tree, said he often heard trucks striking the limb and since 1971, he had observed scars and scrapes on the limb where the limb had been hit by passing trucks. Henry Leroy Fairburn, a carpenter who was repairing a home adjacent to the tree,[3] and Anthony Porocobba, a former Madisonville police officer, testified that they had seen trucks swerve or drive around the limb on occasion.
Mr. Porocobba also noted that his observations regarding trucks scraping or grazing the overhanging limb on Louisiana Highway 21 occurred prior to the DOTD overlaying the roadway in 2000. In January 2000, DOTD commenced a project to widen an over five-kilometer stretch of Louisiana Highway 21 that included the portion of the road where the overhanging limb was located. Larry J. McGee, a DOTD employee who held the position of Engineer and Technician Y, inspected the work of the contractor working on the project. He testified that as a result of the overlay work, the roadway was raised by about an inch and a half. The overlay work was completed on August 16, 2000, a little less than three months prior to Mr. Brown’s accident.
Mr. Brown testified that prior to the date of the accident, he had never traveled that portion of Louisiana Highway 21. He *884 stated that he was driving in that location on the date of the accident because that was the route he had been advised to take. He said that he saw the tree limb hanging over the lane in which he was traveling, but he assumed that the tree limb would not impede his travel because there were no signs or restrictions posted for the roadway.
Louisiana Revised Statute 32:381A(1) states that the “height of any vehicle and its load shall not exceed thirteen feet, six inches, except that the height of any vehicle and its load which operates exclusively on the interstate highway system shall not exceed fourteen feet....” An “operator of a vehicle that is higher than \12thirteen feet six inches shall ensure that the vehicle will pass through each vertical clearance of a structure in its path without touching the structure.” La. R.S. 32:381 A(2) (emphasis added). However, a roadway clearance lower than the maximum legal height for vehicles allowed on the highways of this state constitutes a defect that is hazardous to the motoring public, and therefore a warning of some type is necessary. See Smith v. Southern Pacific Transportation Company, Inc., 467 So.2d 70, 72 (La.App. 4th Cir.1985).
Mr. Brown, as well as his supervisor, Mark Wilkett, and his dispatcher, Dennis Jansen, testified that the truck that Mr. Brown was driving did not exceed the height limitation imposed by Louisiana law. According to the testimony of Duane T. Evans, a witness offered by Mr. Brown and accepted by the trial court as an expert in traffic engineering, he concluded that the limb overhanging the roadway was less than thirteen feet, six inches because of the damage sustained by the truck Mr. Brown was driving on the date of the accident. He further testified that from his review of the plans and testimony regarding the road work completed in August 2006, the road work involved removing approximately two inches of asphalt off of the existing' road and replacing it with approximately four inches of asphalt. He thus concluded that “they effectively raised the surface of the road two inches ... .if the trucks had been clearing it previously, that two inches could have caused enough reduction in clearance to allow a vehicle to hit it.” It is undisputed that there were no signs posted in the area of the overhanging limb warning of a low clearance.
Hence, it was established that the truck Mr. Brown was driving did not exceed the legal height limitations imposed by La. R.S. 32:381 A. It was also established that the overhanging limb constituted a hazardous defect, in that the limb was lower than the maximum legal height allowed for vehicles on the state highways, see Smith, 467 So.2d at 72, and that the defect had existed for such a 113period of time that DOTD can be held to have had constructive notice of the defect,[4] but failed to take corrective action within a reasonable time. See Thompson v. State, 97-0293, p. 3 (La.10/31/97), 701 So.2d 952, 956 n. 3. Accordingly, the record supports a finding that DOTD violated its duty to maintain the roadway in reasonably safe condition for the motoring public.
Nevertheless, in its fifth assignment of error, DOTD contends that Mr. Brown failed to establish that his injuries were caused by the November 10, 2000 accident, as opposed to a later incident wherein Mr. Brown reported injuring him *885 self while trying to secure a tarp over a load that he was transporting in December 2000. In addition to proving that the roadway that was in the custody of the DOTD was defective because it had condition that created an unreasonable risk of harm and that DOTD had actual or constructive notice of the defect, it must also be shown that the defect in the roadway was a cause in fact of Mr. Brown’s injuries. See Thompson, 97-0293 at 2, 701 So.2d at 955.
DOTD relies on a June 19, 2001 medical report from Dr. Jack G. McNeill, an orthopedist who was engaged to perform a “Required Medical Examination” on Mr. Brown, to support its contention that the November 10, 2000 accident did not cause Mr. Brown’s injuries. In that report, Dr. McNeill recounts:
Mr. Brown says that he did return to work and did pretty well until he was assigned a drive to Oklahoma. He said that he had to stop at one point and pull the tarpaulin down over his load and the wind caught it and he strained his neck.... After his trip he returned to Houston and saw Dr. Orengo again on December 7. He was treated with medication and taken off work again. More x-rays were made. He has never returned to work.
DOTD also alleges that x-ray films of Mr. Brown taken prior to the December 2000 incident further support its contention that Mr. Brown’s injuries were not caused by the November 10, 2000 accident.
| ^Immediately following the accident, Mr. Brown testified that he felt sore and stiff, but he took over-the-counter pain medication such as Tylenol or ibuprofen for the pain and presumed “it was going to blow over.” When his symptoms did not abate, Mr. Brown went to the emergency room of Memorial Hermann Baptist Beaumont Hospital in Beaumont, Texas on November 25, 2000. The initial intake/admission forms completed for that visit disclose that Mr. Brown reported to the triage nurse that he had been involved in a motor vehicle accident two weeks prior to the visit and that three days prior to the visit, he began to experience back pain on his left side. According to an assessment note, the triage nurse found that Mr. Brown had pain in his left shoulder and that his left fingers felt numb. An order was placed to have Mr. Brown’s cervical spine and shoulder x-rayed, but it is recorded that Mr. Brown “eloped” before any further medical evaluation could be performed. At trial, Mr. Brown stated that he left before seeing a doctor after waiting six hours to be seen.
Two days later, Mr. Brown visited the emergency room of the East Houston Regional Medical Center in Houston, Texas. His chief complaint during that visit was back pain that had grown worse since the accident and problems with urination that consisted of a burning sensation while urinating and blood in the urine. An x-ray of Mr. Brown’s lumbar spine was ordered that revealed “[n]o fracture, subluxation, or significant disc space narrowing. There is mild spondylosis at L4 and L5.” The clinical impression from that visit was of acute myofascial lumbar strain for which he was prescribed various medications and instructed to rest and soak in warm baths.
Thereafter, Mr. Brown was seen by Dr. Antonio Orengo on December 1, 2000. In a progress note for that visit, Dr. Orengo recorded that Mr. Brown was “off work,” but Mr. Brown had told him he needed to work and that he would like to return to work. Dr. Orengo diagnosed Mr. Brown as having muskoskeletal |1Rstrain of the paraspinal muscle region. Mr. Brown returned to work and worked until his next visit with Dr. Orengo on December 7, 2000.
*886 The foregoing evidence clearly supports a finding that the November 10, 2000 accident caused injury to Mr. Brown’s back and neck. Moreover, two of Mr. Brown s treating physicians expressly related his injuries to the November 10, 2000 accident, despite knowledge of the December 2000 incident. The video deposition testimony of Dr. Patrick McMeans, who specialized in pain management, was presented to the jury at trial. In his deposition, Dr. McMeans related Mr. Brown’s injuries to his November 10, 2000 accident, explaining that the tarp injury when “compared to the injury he suffered when he struck the tree limb is relatively minor, because he did not suffer a deceleration injury.” Likewise, Dr. Jerry Keepers, who also specialized in pain management, testified via a video deposition to the jury that in his medical opinion, it “would be very unlikely to herniate five discs in the neck just from tugging on a tarp.”
Finally, Dr. Stephen I. Esses, a board certified orthopedic surgeon that examined Mr. Brown, explained why the extent of Mr. Brown’s neck and back injuries were not recognized on earlier x-ray film taken of Mr. Brown. Dr. Essess stated that an x-ray only shows the bones of the spine. It does not show the discs, ligaments, spinal cord, nerve roots, or musculature. Thus, he stated “unless there’s a fracture, unless there’s some gross misalignment in the spine, none of the other types of problems that we’re here talking about would show up on an x-ray.” We observe that the earlier x-ray film was a scan of Mr. Brown’s lumbar spine, not his cervical spine.
Based on this evidence, we cannot say that the jury manifestly erred in finding that the injuries sustained by Mr. Brown were caused by the November 10, 2000 accident. See Benjamin ex rel. Benjamin v. Housing Authority of New Orleans, 04-1058, p. 7 (La.12/1/04), 893 So.2d 1, 6.
| ^LIABILITY OF MR. BROWN
In his first assignment of error, Mr. Brown disputes the jury’s finding that he was proportionately at fault in causing the accident in which he sustained injuries. Like all factual findings, the standard of review of comparative fault allocations is that of manifest error. Leonard v. Ryan's Family Steak Houses, Inc., 05-0775, p. 13 (La.App. 1st Cir.6/21/06), 939 So.2d 401, 410. Mr. Brown argues there is no basis in the record for allocating him with any fault, citing Smith, 467 So.2d 70. In that case, the defendant, the City of New Orleans, tried to argue that the plaintiff, a professional truck driver, was contributorily negligent in failing to appreciate the obstruction presented by a railroad underpass that was not posted as having a low clearance and that “was considerably lower than the maximum legal height of vehicles allowed on the highways of this state.” Smith, 467 So.2d at 72. In rejecting the city’s argument, the Fourth Circuit held “a motorist should not be placed in the position of having to estimate a clearance upon approaching it unless it is quite obvious that the vehicle cannot pass.” Smith, 467 So.2d at 72.
At trial, Mr. Brown testified, “I could see the tree, but there is no way I could tell that limb was too low....” He also testified that the route he was driving at the time of the accident was a truck route and that 18-wheelers were not restricted from driving in that area. Prior to the date of accident, Mr. Brown had never driven on the road. Photographs of the 18-wheeler Mr. Brown was driving at the time of the accident display damage to the top, front edge of the truck’s trailer.
Mr. Evans, the traffic engineering expert offered by Mr. Brown, testified that *887 he did not know if it would be obvious that the tree limb fell below the legal limit for vertical clearance. As he explained, “I don’t think [Mr. Brown] had an opportunity to know that that limb was below the height of his vehicle. So I don’t think he did anything improper. He assumed that he could travel that route if he |17didn’t see a sign saying he couldn’t.” Mr. Evans further observed that Louisiana Highway 21 is a two-lane road and that if Mr. Brown “swerved” to avoid the tree limb, he would go into the opposing lane, which would be a hazard. Finally, Mr. Evans opined that evidence of other truck drivers maneuvering around the tree limb indicated that those drivers were probably aware of the condition and were trying to avoid it.
No countervailing evidence was offered by the DOTD on this point. We particularly note that if DOTD employees, who were charged with inspecting and maintaining the roadway and who admitted observing the overhanging tree limb and evidence of the tree limb having been impacted, did not view the limb as posing a hazard to the motoring public, Mr. Brown cannot be held liable for not appreciating such danger. Therefore, considering the evidence that was presented, we find that the trial jury manifestly erred in assessing Mr. Brown with any fault for the accident.

PAST AND FUTURE LOST WAGES

We further find no merit in the DOTD’s assignments of error numbers three and four, contending that the awards of past and future lost wages awarded Mr. Brown were an abuse of the jury’s discretion. A plaintiff seeking damages for past lost wages bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident. Boyette v. United Services Auto. Assn., 00-1918, p. 3 (La.4/3/01), 783 So.2d 1276, 1279. The trier of fact has broad discretion in assessing awards for lost wages, but there must be a factual basis in the record for the award. Driscoll v. Stucker, 04-0589, p. 29 (La.1/19/05), 893 So.2d 32, 53. Where there is no basis for a precise mathematical calculation of a past lost wage claim, the trier of fact can award a reasonable amount of damages without abusing his discretion. Burrell v. Williams, 05-1625, p. 10 (La.App. 1st Cir.6/9/06), 938 So.2d 694, 701.
| iRMr. Brown worked as a company driver for Triad Transport, Inc. for approximately two months. Dr. Bettinger “annualized” Mr. Brown’s earnings for that two-month period and determined that Mr. Brown would have made at least $43,000 per year up until the time of trial. He multiplied that amount by the number of years that had elapsed from the date of Mr. Brown’s accident until the date of his report, and calculated the amount of $260,006 as Mr. Brown’s past lost wages. Dr. Bettinger stated that the amount calculated was “extremely conservative,” since no consideration for increases of any nature were given in calculating that sum.
As for Mr. Brown’s future earning capacity, Dr. Bettinger calculated Mr. Brown’s future earning capacity to be $52,000 per year, based largely on the testimony of Mr. Brown’s prior employer, whom he said had testified that Mr. Brown had the potential to earn between $50,000 to $90,000 per year.[5] Dr. Bettinger then *888 determined from the Bureau of Labor Statistics that Mr. Brown would have stayed in the labor force until age 65, assuming he had the capacity to work until that age.[6] He then multiplied the future annual salary amount he had projected for Mr. Brown by a two percent productivity rate increase and discounted the amount to present value dollars to reach an estimated total value future income stream for Mr. Brown until age 65 of $769,992.
The jury was also presented with testimony from an economics expert offered by DOTD, Dr. Kenneth J. Bou-dreaux, who calculated Mr. Brown’s past lost wages based on an average of the five years net income shown on Mr. Brown’s | istax returns for the years 1997 through 2000. Dr. Boudreaux described Mr. Brown’s net income as being “volatile,” and as such, it was his opinion that an average of Mr. Brown’s past earnings had to be calculated and that sum used to determine his past and future earning capacity. According to Dr. Boudreaux, Mr. Brown’s net income for the tax years 1996-2000 was: $27,000 in 1996; $38,000 in 1997; $12,300 in 1998, $3,937 in 1999; and a negative $1,952 in 2000.[7] Dr. Boudreaux then used those amounts to calculate an estimated annual income of $16,394.00. He therefore calculated Mr. Brown’s past lost wages up through the time of trial as $99,460.27. He then calculated a future loss of income of $123,951.00, assuming that Mr. Brown is totally disabled for the remainder of his work life expectancy, which he calculated to be 14.4 years from the date of Mr. Brown’s accident in November 2000, based on national statistical tables he consulted.
Apparently the jury found merit in both experts’ testimony, as the amounts awarded Mr. Brown for past and future lost wages were simply an average of the amounts calculated by the competing experts. Where, as here, a conflict in the evidence exists and neither party presents evidence that is wholly inconsistent, implausible on its face, or unbelievable in light of objective evidence, the appellate court must defer to the factfinder’s decision unless that decision is manifestly erroneous or clearly wrong. Henderson v. Nissan Motor Corporation U.S.A., 03-606, p. 14 (La.2/6/04), 869 So.2d 62, 71. Having reviewed the evidence presented, we cannot say that the amounts awarded Mr. Brown for past and future lost wages was an abuse of the jury’s discretion. Accordingly, we reject the DOTD’s assignments of error so alleging.
| ^FUTURE MEDICAL EXPENSES
We likewise reject the DOTD’s remaining assignment of error alleging that the award of future medical expenses was an abuse of the jury’s discretion because there was no evidence presented to support the award. As acknowledged by the DOTD in briefing this assignment of *889 error, Dr. Keepers, Mr. Brown’s treating physician, did testify regarding the medical treatment and medications Mr. Brown will require in the future as a result of his injuries.
Dr. Keepers testified that as a result of Mr. Brown’s cardiac and other health problems, he cannot undergo any type of surgical procedure, and as a consequence, he testified that his “best guess is he’s going to be on this medication for the rest of his life.” The medication that Dr. Keepers referred to was OxyContin, Vico-din, Soma and Phenergan. Further, because of the OxyContin prescription, Dr. Keepers stated that Mr. Brown would have to see a physician monthly in order to obtain needed refills of the narcotic medication. Finally, Dr. Keepers stated that he anticipated administering epidural steroid injections to Mr. Brown’s lumbar and cervical spine areas at least once a year and that Mr. Brown would also require periodic diagnostic tests every two to three years, such as MRIs and EMGs.
Dr. Esses agreed with Dr. Keepers’ assessment that it is unlikely that Mr. Brown’s other health conditions would improve sufficiently that he would be able to undergo the surgeries that were recommended to alleviate his pain. Dr. McMe-ans concurred with Dr. Keepers’ finding that in the future Mr. Brown will continue to need epidural steroid injections in his neck and back and that Mr. Brown will continue to require medications similar to the ones that he was taking at the time Dr. McMeans was deposed.
Although future medical expenses must be established with some degree of certainty, they do not have to be established with absolute certainty, as an award for future medical expenses is by nature somewhat speculative. Grayson v. R.B. Ammon and Associates, Inc., 99-2597, p. 35 (La.App. 1st Cir.11/3/00), 778 So.2d 1, 23, writs denied, 00-3270, 00-3311 (La.1/26/01), 782 So.2d 1026, 1027. An award of future medical expenses is justified if there is medical testimony that they are indicated and setting out their probable cost. Hanks v. Seale, 04-1485, p. 16 (La.6/17/05), 904 So.2d 662, 672. In such a case, the court should award all future medical expenses that the medical evidence establishes that the plaintiff, more probable than not, will be required to incur. Hymel v. HMO of Louisiana, Inc., 06-0042, pp. 26-27 (La.App. 1st Cir.11/15/06), 951 So.2d 187, 206, writ denied, 06-2938 (La.2/16/07), 949 So.2d 425. An appellate court should not set aside an award for future medical expenses absent an abuse of the trier of fact’s discretion. Hymel, 06-0042 at 27, 951 So.2d at 206.
Based on the evidence presented, as outlined above, we do not find that the jury abused its discretion in awarding Mr. Brown future medical expenses.

GENERAL DAMAGES

In Mr. Brown’s remaining assignments of error, he contests the jury’s award of general damages for past and future physical pain and suffering. When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La. C.C. arts.1999 and 2324.1. In reviewing an award of general damages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 *890 So.2d at 1261. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the |22highest or lowest point of an award within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976).
All of Mr. Brown’s treating physicians stated that he will suffer from chronic pain for the rest of his life, without much hope of abatement, because Mr. Brown is unable to undergo any of the surgical procedures that could possibly relieve his pain to any significant degree.[8] Dr. Keepers opined that Mr. Brown is probably going to end up being in more pain than the usual patient for the rest of his life.
Mr. Brown suffers from disc herniation at the L4-5 level in his lumbar spine and at all levels of his cervical spine. As described by Dr. Keepers, Mr. Brown also suffers from spasms in the paraspinous muscles of his low back and in his neck, with the spasms sometimes radiating into his shoulders. Dr. Keepers said there is nothing medically that can be done for Mr. Brown that could restore him to his pre-accident condition and alleviate his pain, and so the most he can try to do for Mr. Brown is attempt to minimize his pain as much as possible. He stated that over time discs tend to get worse because they are not going to repair themselves, and if the discs collapse enough, the vertebral bodies of Mr. Brown’s spine will rub on top of each other in a way that Dr. Keepers described as “bone on bone.” Dr. Keepers considered Mr. Brown to be permanently and totally disabled from his injury.
The record reveals that prior to the November 10, 2000 accident, Mr. Brown had no history of pain or problems with his neck or back; however, following the accident, Mr. Brown has been rendered disabled from working. Mr. Brown testified that his injury has further affected his personal life in that he is unable to | ¡aspend quality time with his family because of pain and the medication he is taking. He specifically noted being unable to attend his son’s T-Ball games, because he cannot endure the pain of sitting on a hard bench at the ballpark. Additionally, some of Mr. Brown’s medications restrict his exposure to sunlight. Mr. Brown also related that he was unable to visit his mother, who was suffering from some health problems at the time of trial, because he could not physically endure the long car ride. Further as a result of his injuries, Mr. Brown stated that he has trouble sleeping, that he feels helpless and stressed, and that his injuries have adversely affected his sex life.
The jury awarded Mr. Brown general damages not only for his physical pain and suffering, but also for his mental pain and suffering and loss of enjoyment of life, for a total general damages award of $78,000. Considering the evidence presented, we find that the jury abused its discretion in the amount of general damages awarded Mr. Brown. The minimum amount that *891 was within the jury’s discretion to award was $40,000 for past physical pain and suffering and $120,000 for future physical pain and suffering, for a total general damages award of $188,000. See Bellard v. American Central Ins. Co., 07-1335 (La.4/18/08), 980 So.2d 654 ($200,000 in general damages awarded); Cheramie v. Contract Haulers, Inc., 98-1399 (La.App. 1st Cir.9/24/99), 754 So.2d 987 ($200,000 in general damages awarded); Keller v. City of Plaquemine, 96-1933 (La.App. 1st Cir.9/23/97), 700 So.2d 1285, writ denied, 97-2635 (La.1/16/98), 706 So.2d 977($125,-000 in general damages awarded); see also Stewart v. Ice, 07-0871 (La.App. 4th Cir.4/9/08), 982 So.2d 928, writ denied, 08-1000 (La.8/29/08), 989 So.2d 101 ($350,000 in general damages awarded); Beard v. Coregis Insurance Co., 07-314 (La.App. 3d Cir.10/17/07), 968 So.2d 278 ($110,000 in general damages awarded); Fox v. Anderson, 05-934 (La.App. 3d Cir.3/1/06), 924 So.2d 399, writ denied, 06-0722 (La.6/23/06), 930 So.2d 977 ($175,000 in general damages awarded); Sepulvado v. Turner, 37,912 (La.App.2d Cir.12/10/03), 862 So.2d 457, writ denied, 04-0089 (La.3/19/04), 869 So.2d 855 ($250,000 in general damages awarded).
CONCLUSION
For the foregoing reasons, we amend the judgment of the trial court to increase the amount awarded Mr. Brown for past physical pain and suffering to $40,000 and future physical pain and suffering to $120,000, We further amend the judgment to eliminate any finding of fault on the part of Mr. Brown and to allocate one hundred percent fault to the DOTD. In all other respects, we affirm the judgment of the trial court finding DOTD liable for the injuries sustained by Michael Brown on November 10, 2000. All costs of this appeal, in the amount of $2,334.75, are assessed to the State of Louisiana, through the Department of Transportation and Development.
AMENDED, AND AS AMENDED, AFFIRMED.
DAWNING, J., concurs.
HUGHES, J., dissents in part and assigned reasons.

. Mr. Brown also raised a fourth assignment of error in the event that the DOTD asserted the applicability of La. R.S. 13:5106 B(3)(c) as a defense on appeal. As the DOTD did not raise the defense, we pretermit discussion of that assignment of error.

. The source of the text for La. C.E. art. 702 is Rule 702 of the Federal Rules of Evidence. As the text of both statutes are virtually identical, it has been held to be proper to consider federal jurisprudence interpreting F.R.E. 702 to determine the proper application of the state article. State v. Foret, 628 So.2d 1116, 1121 (La.1993).

. Weldon Wallace Poole, Jr. owned the house at which Mr. Fairburn was performing carpentry repairs. In his deposition testimony, which was placed into evidence at trial, Mr. Poole acknowledged that he was considered the owner of the tree, but stated that there was some debate over whether he or the City of Covington actually owned the tree.

. Arguably, DOTD could be held to have had actual notice of the defect as well based on the observations of its employees and its action of overlaying the highway to increase the height of the roadway by one and a half inches, thereby further decreasing the vertical clearance of the roadway in the area of the overhanging limb.

. Mr. Wilkelt, Mr. Brown’s supervisor with Triad Transport, Inc., testified of a salary in the low $50,000 range for company drivers and that Kevin Matthews, Mr. Brown's supervisor with Cryogenic Transportation, Inc., testified that the average gross revenue earned by owner-operators employed with his company was from $90,000 to $200,000. Since the projected annual amount that Dr. Betting-er assumed Mr. Brown could have earned *888 falls within the company driver range that Mr. Wilkett discussed, we find this discrepancy in Dr. Bettinger's testimony to be of no consequence.

. Dr. Bettinger additionally expressed his belief that the average age for participation rates in the labor force would continue to rise because of federal laws increasing the age at which citizens could collect social security to age 67.

. The actual net incomes as shown on Mr. Brown’s tax returns were: $26,551 in 1996; $34,758 in 1997; $12,397 in 1998, $4,457 in 1999; and a negative $2,263 in 2000. These amounts, however, are not truly reflective of the amounts Mr. Brown actually earned nor of the amounts Mr. Brown could earn, as the jurisprudence is clear that gross rather than net income is used when determining lost wages. Blanchard v. Means Industries, Inc., 93-715 (La.App. 5th Cir.3/16/94), 635 So.2d 288, 293.

. An intradiscal electrothermal coagulapathy (IDET) procedure was performed on Mr. Brown's lumbar disc on December 13, 2001, roughly one year following his accident. The procedure involved placing Mr. Brown under anesthesia, inserting a needle into the problem disc, and then inserting a wand through the needle to encircle the periphery of the problem disc. The wand was then used to burn the fibers around the periphery of the disc at a very high temperature in an effort to shrink the disc and alleviate pressure on the nerve root. The procedure was not successful. Thereafter, before any further surgical intervention could be attempted, Mr. Brown developed other health problems, particularly cardiac problems, which prevented him from undergoing any additional surgical procedures.