WELCH, J.
IsThe plaintiffs, Frances Robertson, Phillis Castille, Leslie Robertson, and Stewart Roberston, appeal a judgment granting summary judgment in favor of defendant, The Sherwin-Williams Company (“Sherwin-Williams”), dismissing their survival and wrongful death claims against Sherwin-Williams and a judgment granting a motion to strike the testimony of the plaintiffs’ expert on medical causation, Dr. Eugene J. Mark. We reverse both judgments of the trial court and remand for further proceedings.
FACTUAL AND PROCEDURAL HISTORY
On June 30, 2004, Harris Roberston was diagnosed with mesothelomia and on No *343 vember 27, 2004, he died from the disease. On May 26, 2005, the plaintiffs, Harris Robertson’s wife and children, filed this lawsuit against a host of defendants that they claimed were responsible for manufacturing, supplying, selling, or exposing Harris Robertson to asbestos-containing products, including but not limited to Georgia-Pacific Corporation (“Georgia-Pacific”) [2], Union Carbide Corporation (“Union Carbide”) and Sherwin-Williams.[3] Essentially, the plaintiffs alleged that Georgia-Pacific manufactured and sold asbestos-containing products, that Union Carbide sold, distributed, and supplied raw asbestos, and that Sherwin-Williams was a supplier or distributor of asbestos-containing products.
In the plaintiffs’ petition, they alleged that Harris Robertson’s fatal disease was caused in part by his exposure to asbestos and asbestos-containing products ^through his work for V.P. Pierret Construction Company from approximately 1960-1970. Specifically, the plaintiffs asserted that during this time frame, Harris Robertson installed sheetrock and was regularly exposed to friable asbestos and asbestos-containing products, which were present in the joint compounds used to finish or float the sheetrock, and as a result of that exposure, asbestos dust and fibers were inhaled or otherwise ingested by Harris Robertson.[4]
On October 8, 2008, Sherwin-Williams filed a motion for summary judgment, asserting that plaintiffs had “no evidence” that Harris Robertson “had any, much less substantial, asbestos exposure from products bought at ‘Sherwin-Williams’ stores, or indeed that [Sherwin-Williams] owned the stores in question.” Thereafter, the plaintiffs filed a motion to continue and a response to Sherwin-Williams’ motion for summary judgment.
In the motion to continue, the plaintiffs contended that they were entitled to a continuance under La. C.C.P. art. 1602[5] because, despite due diligence, material evidence regarding necessary, additional parties had not yet been obtained and because the plaintiffs’ expert, Dr. Mark, had been *344 unavailable to review material evidence and to submit an affidavit in response to the motion for summary judgment. In response to Sherwin-Williams’ motion for summary judgment, the plaintiffs contended that there were genuine issues of material fact as to whether Harris Robertson was exposed to significant amounts of asbestos as a result of the asbestos containing joint compound sold or distributed by Sherwin-Williams.
| .^Additionally, on December 18, 2009, Sherwin-Williams filed a motion to strike portions of the opinion of the plaintiffs’ expert, Dr. Mark, a practicing pathologist and a Harvard Medical School professor of pathology. Specifically, Sherwin-Williams sought an order precluding Dr. Mark from offering what it claimed to be “unreliable testimony that ‘any fiber’ or ‘every exposure above background’ was a substantial contributing factor” in causing Harris Robertson’s mesothelioma.
The plaintiffs opposed the motion to strike, essentially arguing Dr. Mark had not opined that “any fiber” or “every exposure above background” was a substantial contributing factor in causing Harris Robertson’s mesothelioma, as suggested by Sherwin-Williams, and that Dr. Mark’s testimony and conclusions regarding the cause of Harris Robertson’s mesothelioma had been made using valid methodology and was supported by, and consistent with, generally-accepted scientific and medical literature.
After a hearing on January 19, 2010, the trial court denied Sherwin-Williams’ motion for summary judgment and granted Sherwin-Williams’ motion to strike.[6] On February 2, 2010, the trial court signed a judgment denying Sherwin-Williams’ motion for summary judgment,[7] and on February 23, 2010, the trial court signed a judgment granting Sherwin-Williams’ motion to strike.
On January 25, 2010, Sherwin-Williams filed a motion for new trial on the denial of its motion for summary judgment, contending that it was entitled, under La. C.C.P. art. 1973 to a new trial because the “plaintiffs cannot establish that any 1 ^asbestos exposure for which Sherwin-Williams is responsible was a substantial contributing factor in causing” Harris Robertson’s mesothelioma. Specifically, Sher-win-Williams argued that after the trial court denied its motion for summary judgment, the trial court granted Sherwin-Williams’ motion to strike portions of the testimony of Dr. Mark, and without Dr. Mark’s opinion on specific or medical causation, the plaintiffs had no other expert testimony establishing specific or medical causation, i.e., that the alleged asbestos exposure from products purchased at Sherwin-Williams was a substantial contributing factor in causing Harris Robertson’s mesothelioma.
Additionally, on February 19, 2010, the plaintiffs filed a motion for new trial on the grant of Sherwin-Williams’ motion to *345 strike portions of the opinion of Dr. Mark.[8] At a hearing on March 2, 2010, the trial court denied the plaintiffs’ motion for new trial on the motion to strike, granted Sher-win-Williams’ motion for new trial on its motion for summary judgment, and granted Sherwin-Williams’ motion for summary judgment “regarding substantial contributing cause,” thereby dismissing the plaintiffs’ claims against Sherwin-Williams.[9]
On April 6, 2010, the trial court signed a judgment denying the plaintiffs’ motion for new trial on the motion to strike, granting Sherwin-Williams’ motion for new trial on its motion for summary judgment, and granting Sherwin-Williams’ motion for summary judgment “regarding substantial contributing cause,” and on April 5, 2011, the trial court signed a supplemental judgment, which in addition to containing the provisions set forth in the April 6, 2010 judgment, also dismissed [7the plaintiffs’ claims against Sherwin-Williams with prejudice.[10]
The plaintiffs have appealed the April 5, 2011 judgment granting Sherwin-Williams’ motion for new trial on its motion for summary judgment and granting Sherwin-Williams’ motion for summary judgment, the February 23, 2010 judgment granting Sherwin-Williams’ motion to strike the testimony of Dr. Mark, and the April 6, 2010 judgment denying their motion for new trial on Sherwin-Williams’ motion to strike.[11]
SHERWIN-WILLIAMS’ MOTION FOR SUMMARY JUDGMENT

Summary Judgment Law

A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. Granda v. State Farm Mutual Insurance Company, 2004-2012, p. 4 (La.App. 1st Cir.2/10/06), 935 So.2d 698, 701. Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue of material fact and that the *346 mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
Summary judgments are reviewed on appeal de novo. Granda, 2004-2012 at p. 4, 935 So.2d at 701. Thus, this court uses the same criteria as the trial court in ^determining whether summary judgment is appropriate — whether there is a genuine issue of material fact and whether mover is entitled to judgment as a matter of law. Jones v. Estate of Santiago, 2003-1424, p. 5 (La.4/14/04), 870 So.2d 1002, 1006.
On a motion for summary judgment, the initial burden of proof is on the moving party. If, however, the moving party will not bear the burden of proof at trial on the matter before the court, the moving party’s burden of proof on the motion is satisfied by pointing out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, the non-moving party must produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial. Failure to do so shows that there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2). Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. Babin v. Winn-Dixie Louisiana, Inc., 2000-0078, p. 4 (La.6/30/00), 764 So.2d 37, 40; see also La. C.C.P. art. 967(B). Any doubt as to a dispute regarding a genuine issue of material fact must be resolved against granting the motion and in favor of a trial on the merits. Fernandez v. Hebert, 2006-1558, p. 8 (La.App. 1st Cir.5/4/07), 961 So.2d 404, 408, writ denied, 2007-1123 (La.9/21/07), 964 So.2d 333.
A “genuine issue” is a “triable issue,” that is, an issue on which reasonable persons could disagree. If, on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Jones, 2003-1424 at p. 6, 870 So.2d at 1006. In determining whether an issue is genuine, a court should not consider the merits, make credibility determinations, evaluate testimony, or weigh evidence. Fernandez, 2006-1558 at p. 8, 961 So.2d at 408.
A fact is material if it potentially ensures or precludes recovery, affects a | nlitigant’s ultimate success, or determines the outcome of the legal dispute. Anglin v. Anglin, 2005-1233, p. 5 (La.App. 1st Cir.6/9/06), 938 So.2d 766, 769. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is “material” for summary judgment purposes can only be seen in light of the substantive law applicable to the case. Dickerson v. Piccadilly Restaurants, Inc., 99-2633, pp. 3-4 (La.App. 1st Cir.12/22/00), 785 So.2d 842, 844.

Burden of Proof in a Mesothelioma case

In this case, the plaintiffs’ action for damages is based on negligence (La. C.C. art. 2315) and strict liability (La.C.C. art. 2317). Under both theories, the standard analysis employed in determining whether to impose liability is the duty/risk analysis. In order for a plaintiff to recover and for liability to attach under a duty/ risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) *347 actual damages (the damages element). Rando v. Anco Insulations Inc., 2008-1163, 2008-1169, pp. 26-27 (La.5/22/09), 16 So.3d 1065, 1086.
In this case, at issue in Sherwin-Williams’ motion for summary judgment was the cause-in-fact element. Cause-in-fact is a question of fact. Rando, 2008-1163 at p. 29, 16 So.3d at 1087. Due to the lengthy latency period between exposure to asbestos and manifestation of the asbestos-related disease, cause-in-fact is considered the “premier hurdle” faced by plaintiffs in asbestos litigation. Rando, 2008-1163 at p. 31, 16 So.3d at 1088. However, notwithstanding thej^difficulty of proof involved, a plaintiffs burden of proof against multiple defendants in a long latency case is not relaxed or reduced because of the degree of difficulty that might ensue in proving the contribution of each defendant’s product to the plaintiffs injury. Rando, 2008-1163 at pp. 35-36, 16 So.3d at 1091. To prevail in an asbestos case, the plaintiff must show by a preponderance of the evidence, he was exposed to asbestos and he received an injury substantially caused by that exposure. Ran-do, 2008-1163 at p. 31, 16 So.3d at 1088. When multiple causes of injury are present, a defendant’s conduct is a cause-in-fact if it is a substantial factor generating plaintiffs harm. Rando, 2008-1163 at p. 31, 16 So.3d 1088.
The Louisiana Supreme Court addressed the causation problem in asbestos-related disease cases in Rando, 2008-1163 at p. 35, 16 So.3d at 1091, by relying on the reasoning of Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1094 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), an asbestosis case, which provided as follows:
[I]t is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel. It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all of the defendants on many occasions. It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury. We think, therefore, that on the basis of strong circumstantial evidence!,] the jury could find that each defendant was the cause in fact of some injury to Borel.
The Borel court also stated that “[whether the defendant’s conduct was a substantial factor is a question for the jury, unless the court determines that reasonable men could not differ.” Id.
In Rando, the supreme court then noted, that “[bjuilding on this early observation [in Borel], Louisiana courts have employed a ‘substantial factor’ test to determine whether exposure to a particular asbestos-containing product was a | n cause-in-fact of a plaintiffs asbestos-related disease.” Rando, 2008-1163 at p. 35, 16 So.3d at 1091. Thus, in an asbestos case, the claimant must show he had significant exposure to the product complained of to the extent that it was a substantial factor in bringing about his injury. Id. Stated differently, the plaintiff must prove, by a preponderance of the evidence that: (1) his exposure to the defendant’s asbestos product was significant, and (2) that this exposure caused or was a substantial factor in bringing about his mesothelioma (or other asbestos-related disease). See Rando, 2008-1163 at p. 38, 16 So.3d at 1092 (ultimately concluding with regard to cause-in-fact that there was “no manifest error in the trial court’s [factual] determination [that] Rando proved by a preponderance of the evidence his exposure to asbestos was significant and [that] *348 this exposure caused his mesothelioma.” (Emphasis added.)). Lastly, the plaintiffs proof in this regard may be by direct or circumstantial evidence.[12] Rando, 2008-1163 at p. 33, 16 So.3d at 1089.

Merits of Shermn-Williams’ Motion for Summary Judgment

At the outset, we note that there is no dispute that there is a causal relationship between asbestos exposure and mesotheli-oma, and that Harris Robertson’s meso-thelioma was caused by his exposure to asbestos. We also note that Harris Robertson died before this suit was filed and that he never testified or gave statements about his work or potential asbestos exposure prior to his death. Hence, the plaintiffs will have to rely largely on circumstantial evidence that reasonably infers that Harris Robertson’s exposure to the defendant’s asbestos-containing product was significant and that this exposure substantially contributed to his mesothelioma.
In Sherwin-Williams’ motion for summary judgment, it alleged that the | ^.plaintiffs had “no evidence” that Harris Robertson “had any, much less substantial asbestos exposure from products bought at ‘Sherwin-Williams’ stores, or indeed that [Sherwin-Williams] owned the stores in question.” Thus, the issues raised in Sherwin-Williams’ motion for summary judgment pertained to whether Harris Robertson’s exposure to asbestos-containing products purchased at (or sold by) Sherwin-Williams was significant. Furthermore, we note, from a review of Sher-win-Williams’ motion for summary judgment[13] that whether the plaintiffs would be unable to establish that the exposure to the asbestos-containing products purchased at (or sold by) Sherwin-Williams caused or was a substantial factor in bringing about Harris Robertson’s mesothelio-ma was not set forth as an issue before the court.
At the hearing on January 19, 2010, the trial court denied Sherwin-Williams’ motion for summary judgment, and following the denial of that motion, Sherwin-Williams attempted, at that same hearing, to raise the issue of whether the exposure was a substantial factor in bringing about Harris Robertson’s mesothelioma. However, the trial court specifically, and correctly, refused to address that issue. See La. C.C.P. art. 966(E)(providing that “a summary judgment shall be rendered or affirmed only as to those issues set forth in the motion under consideration by the court at that time.” (Emphasis added.)).
Thereafter, Sherwin-Williams filed a motion for new trial on the denial of the motion for summary judgment, asserting *349 that it was entitled to a new trial because “plaintiffs cannot establish that any asbestos exposure for which Sherwin-jWilliams1s is responsible was a substantial contributing factor in causing” Harris Robertson’s mesothelioma. Based on this motion, the trial court granted Sherwin-Williams’ motion for new trial and then granted Sher-win-Williams’ motion for summary judgment on “substantial cause.”
Although Sherwin-Williams may have raised the issue of “substantial cause” (ie., whether the exposure to the asbestos-containing products purchased at (or sold by) Sherwin-Williams caused or was a substantial factor in bringing about Harris Robertson’s mesothelioma) in its motion for new trial, it did not raise the issue of “substantial cause” in the underlying motion for summary judgment that was under consideration before the trial court.[14] Therefore, we must conclude that the trial court erred in rendering summary judgment as to that issue. See La. C.C.P. art. 966(E). Nevertheless, since summary judgments are reviewed on appeal de novo, we will review Sherwin-Williams’ motion for summary judgment as to the issues set forth in that motion.
As previously noted, the issues raised in Sherwin-Williams’ motion for summary judgment pertained to whether Harris Robertson “had any, much less substantial asbestos exposure from products bought at ‘Sherwin-Williams’ stores, or indeed that [Sherwin-Williams] owned the stores in question.” Specifically, [ 14Sherwin-WilIiams contended that there was a lack of evidence establishing that Harris Robertson worked with an asbestos-containing joint compound bought at Sherwin-Williams. In support of this contention, Sherwin-Williams pointed to the deposition testimony of three of Harris Robertson’s brothers, Raoul “Bobby” Robertson, Jr., Harold Robertson, and Raymond Robertson, all of whom had previously worked with Harris Robertson in the drywall finishing and painting business, that they did not personally know whether the joint compound products that they purchased (at any store) actually contained asbestos. Additionally, Sherwin-Williams contended that there was a lack of evidence establishing that Sherwin-Williams actually owned the Sherwin-Williams’ stores where the asbestos-containing products were purchased, claiming that at the *350 time the products were purchased there were independent stores (not owned by Sherwin-Williams) that sold Sherwin-Williams’ paint and products and had Sherwin-Williams’ signs. In support of this contention, Sherwin-Williams again relied on the deposition testimony of Harris Robertson’s three brothers that they did not know who owned the Sherwin-Williams stores where the asbestos-containing products were purchased. Additionally, Sherwin-Williams relied on the affidavit of Peter Sedlak, the Vice-President of marketing and purchasing for Sherwin-Williams.[15] According to the affidavit of Peter Sedlak, prior to 1975, Sher-win-Williams’ products were sold both in stores owned and operated by Sherwin-¡Williamsifi and in independent “dealer” stores, such as local hardware or building supply stores, which had no connection to Sherwin-Williams (other than as a “mere vendor”), and that the independent “dealer” stores displayed posters or signage indicating that Sherwin-Williams products were available for sale.
In opposition to Sherwin-Williams’ motion for summary judgment, the plaintiffs argued that there were genuine issues of material fact precluding summary judgment. Specifically, the plaintiffs asserted that the evidence established genuine issues of material fact as to whether “Gold Bond” was an asbestos-containing joint compound, whether Harris Robertson routinely used the asbestos-containing “Gold Bond” joint compound in his drywall work, and whether Harris Robertson (or other people for or with whom he worked) purchased the asbestos-containing joint compound “Gold Bond” from Sherwin-Williams’ stores.[16] In support of its opposition to the motion for summary judgment, the plaintiffs also relied on the deposition testimony of Harris Robertson’s three brothers (Harold Robertson, Raymond Robertson, and Raoul Robertson), as well as Sherwin-Williams’ responses to the *351 plaintiffs’ interrogatories and requests for production of documents.
The deposition testimony of Harris Robertson’s three brothers established that Harris Robertson was a drywall finisher and painter in residential construction from the early 1960s until 2003, when he was no longer able to work due to his disease. By all accounts, the entire drywall finishing process — from mixing the dry joint-compound products in a bucket, sanding the walls and ceilings, and 11ficleaning the area afterwards — was a very dusty process, during which they would inhale the dust and the dust would fall all over them and their clothing.
Harris Robertson initially started performing drywall finishing work and painting in the Lafayette area. Harold Robertson testified that he performed some work with Harris Robertson during this time, and specifically recalled that they used “Gold Bond,” “Welcote” and “Georgia-Pacific” joint compounds. Harold Robertson testified that Harris Robertson purchased his supplies from “Sherwin-Williams,” “Doug Ashy,” “Georgia Pacific,” “Glidden,” “Northside,” and “Top’s.” With regard to Harris Robertson’s purchases from “Sher-win-Williams,” Harold Robertson admitted that he did not know if the stores were owned by Sherwin-Williams or whether it was a store owned by someone else that sold Sherwin-Williams products. Harold Robertson admitted that he did not go with Harris Robertson to buy the supplies, but he knew that Harris Robertson purchased his supplies from Sherwin-Williams because Harris Robertson would tell Harold Robertson that was where he had been. Harold Robertson did not know whether any of the joint-compound purchased at Sherwin-Williams contained asbestos, but simply recalled using a lot of “Gold Bond” joint compound.
Around 1965, Harris Robertson moved to Baton Rouge to work for two painting contractors, Martin Richard and R.B. Parker. Harold Robertson testified that he moved to Baton Rouge to help Harris Robertson with the drywall finishing and painting work that he was performing for Martin Richard. During the time that Harris Robertson and Harold Robertson were working in Baton Rouge for Martin Richard, Martin Richard purchased all of their supplies — including the joint compound and paint — from Glidden and Sher-win-Williams. Harold Robertson specifically recalled using “Gold Bond” and “Welcote” joint compounds while working with Harris Robertson in Baton Rouge.
Raymond Robertson testified that in 1968, he also moved to Baton Rouge to 117perform drywall finishing and painting work for Martin Richard. Raymond Robertson testified that while working for Martin Richard, Martin Richard supplied their paint and joint compound, and specifically recalled that Martin Richard purchased those supplies (the paint and joint compound) from Sherwin-Williams because he rode with Martin Richard to the store, which had a Sherwin-Williams sign in the front of it.
Around 1970, Harris Robertson left Baton Rouge and moved back to the Lafayette area and performed drywall finishing and painting work for V.P. Pierret, Ray Montgomery, Gene Bienvenu, and himself. Raymond Robertson testified that he also moved back to the Lafayette area around this time and went to work for Harris Robertson. Raymond Robertson testified that at that time, either the contractor or Harris Robertson furnished the supplies, and he specifically recalled Harris Robertson making purchases from “Top’s,” “Doug Ashy,” “Northside,” “Glidden,” and “Sher-win-Williams” and using “Gold Bond” products.
*352 Bobby Robertson testified that he performed residential drywall finishing and painting work in the Lafayette area with Harris Robertson. Bobby Robertson further testified that when he purchased supplies for his work, he “always dealt” with Sherwin-Williams, as Sherwin-Williams was his retailer of choice, although he admitted that on occasion, if he ran out of materials in the middle of a job, he would purchase the necessary supplies from the business closest to the job in order to complete the job. Bobby Robertson specifically recalled working with Harris Robertson when the supplies had been purchased from Sherwin-Williams and specifically recalled purchasing “Gold Bond” joint compound from Sherwin-Williams, and in particular, the Sherwin-Williams store in New Iberia.
According to Sherwin-Williams’ responses to interrogatories and requests for production of documents, Sherwin-Williams admitted and submitted supporting documentation that it manufactured, marketed and/or sold the following products hsthat contained asbestos: Hi-Bild Texture Coating H66WY16 and Heavy Duty Latex Paint Bone White B85WA129. Sherwin-Williams also admitted and submitted supporting documentation that it sold, through its stores, the asbestos-containing joint compound products of Proko, U.S. Gypsum, National Gypsum and Bon-dex/Reardon. Furthermore, according to the documents produced by Sherwin-Williams, National Gypsum manufactured numerous “Gold Bond” joint compounds which contained asbestos and that the dry joint compounds and cements it manufactured contained asbestos from approximately 1935 until late 1975, and that the sales of the asbestos-containing joint compounds may have continued until 1976. National Gypsum purchased its asbestos fibers in the 1960s primarily from Johns-Manville and in 1967, began purchasing asbestos from Union Carbide.
Based on our de novo review of the record, we find that the plaintiffs have put forth sufficient evidence establishing that there are genuine issues of material fact as to whether “Gold Bond” was an asbestos-containing joint compound, whether Harris Robertson routinely and regularly used and inhaled (and was thus significantly exposed to) the asbestos-containing “Gold Bond” joint compound in his drywall finishing work, and whether Harris Robertson (or other people for or with whom he worked) purchased the asbestos-containing joint compound “Gold Bond” from Sher-win-Williams’ stores. Accordingly, we conclude that Sherwin-Williams was not entitled to summary judgment on the issue of whether Harris Robertson had substantial asbestos exposure from products bought at Sherwin-Williams owned stores.
Furthermore, since we have concluded that Sherwin-Williams was not entitled to summary judgment on the issues before the court in its motion for summary judgment, we must likewise conclude that Sherwin-Williams was not entitled to a new trial on its motion for summary judgment and that the trial court 11nabused its discretion in granting Sherwin-Williams’ motion for new trial. Therefore, the April 5, 2011 judgment of the trial court granting Sherwin-Williams’ motion for new trial and granting Sherwin-Williams’ motion for summary judgment is reversed.
SHERWIN-WILLIAMS’ MOTION TO STRIKE
According to the record, the plaintiffs are relying on the expert opinion of Dr. Mark to establish that Harris Robertson’s significant exposure to asbestos-containing joint compounds manufactured or sold by the defendants was a substantial factor in bringing about or causing his mesothelio- *353 ma. Dr. Mark, a 1967 Harvard Medical School graduate, is employed as a pathologist in the Department of Pathology at Massachusetts General Hospital and practices primarily in pulmonary and autopsy pathology. Dr. Mark is also a professor at Harvard Medical School, and he serves as a co-director of several post-graduate courses relating to pathology and asbestos-related lung diseases.
In Sherwin-Williams’ motion to strike, it sought an order precluding Dr. Mark from “offering unreliable testimony that ‘any fiber’ or ‘every exposure above background’ was a substantial contributing factor in causing Mr. Harris Robertson’s disease.”[17] In response to this motion to strike, the plaintiffs contended that Dr. Mark has not, and will not, testify that any asbestos fiber inhaled contributes to mesothelioma or that the inhalation of a single asbestos fiber is sufficient to cause mesothelioma. Instead, the plaintiffs urged that Dr. Mark’s opinion was that each of Harris Robertson’s “special” exposures to asbestos, which occurred prior to the development of his mesothelioma, including those special exposures to products sold by Sherwin-Williams, was a substantial contributing factor in the development of his disease.
|g()A hearing on the motion to strike was held on January 19, 2010. At the hearing, no testimonial evidence was offered by either Sherwin-Williams or the plaintiffs. Instead, they both relied on the exhibits attached to their respective memorandums on the matter. Following the argument of counsel on the issue, the trial court ruled as follows:
The Sherwin-Williams motion is granted. I strike the portions of the opinion of Dr. Eugene Mark and prohibit him from offering testimony that any fiber or every exposure above background was a substantial contributing factor in causing Mr. Robertson’s disease. I agree that there’s no foundation for this expert to offer such an opinion. He has no epidemiology study to rely upon, he does not know what the dose would have been as to any particular defendant, so I believe the motion is well grounded and I grant the motion as written by Sherwin-Williams.
On February 23, 2010, the trial court signed a judgment with regard to this motion, which provided:
Dr. Mark has no foundation to offer a causation opinion that alleged asbestos exposure from any particular Defendant was a substantial contributing factor to the causation of [Harris Robertson’s] mesothelioma and his opinions regarding causation are found by this Court to be unreliable.
And it is, therefore, ORDERED, ADJUDGED, and DECREED that [Sherwin-Williams’] Motion to Strike Portions Of The Opinion of Dr. Eugene Mark is GRANTED in its entirety as written and Dr. Mark is prohibited from testifying that “each of the exposures to asbestos which occurred prior to the occurrence of the malignancy was a substantial contributing factor in the causation of diffuse malignant mesothelioma” or any similar opinion which advances or incorporates the “any exposure above background” or “every fiber” theory.
On appeal, the plaintiffs contend that the trial court erred in granting the motion to strike and in granting and signing a judgment that far exceeded the scope of *354 the relief sought by Sherwin-Williams. We agree.
First and foremost, we agree with the plaintiffs that both Sherwin-Williams and the trial court have mischaracterized the substance of Dr. Mark’s testimony. We have reviewed the affidavit and the expert report attached thereto of Dr. Mark that are contained in the record and do not see that Dr. Mark opined that every |⅞1 single asbestos fiber inhaled contributes to an individual’s mesothelioma or that the inhalation of a single asbestos fiber was sufficient to cause mesothelioma. Instead, based on our review, we find that Dr. Mark’s opinion, in sum, is that each “special” exposure to asbestos constitutes a significant contributing factor, and he defined a “special” exposure as an exposure for which there is scientific reason to conclude that such an exposure creates the risk of developing the disease, and that each of the special exposures to asbestos contributes to the total dose that causes diffuse malignant mesothelioma in a given patient and, in doing so, shortens the period necessary for diffuse malignant meso-thelioma to develop. Since each exposure to asbestos contributes to the total dose of asbestos disease and shortens the necessary period for asbestos disease to develop, Dr. Mark concludes that each exposure to asbestos is, therefore, a substantial contributing factor to the development of the disease that actually occurred, when it actually occurs.
Next, we must determine whether the trial court erred in concluding that Dr. Mark’s opinions with regard to causation were “unreliable.” Under the Louisiana Code of Evidence, a witness qualified as an expert by “knowledge, skill, experience, training, or education” should be allowed to testify if his “scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.” La. C.E. art. 702; see Corkern v. T.K. Valve, 2004-2293, p. 5 (La.App. 1st Cir.3/29/06), 934 So.2d 102, 105.
In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court set forth the criteria for determining the reliability of expert scientific testimony. The United States Supreme Court found that when, “[f]aced with a proffer of expert scientific testimony, ... the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.” Daubert, 509 U.S. at 592, 113 S.Ct. at 2796. The Supreme Court explained that this would entail a “preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.” Daubert, 509 U.S. at 592-593, 113 S.Ct. at 2796. The Supreme Court then enumerated factors that the trial court may consider in fulfilling this “gatekeeping role:” the testability or refutability of the expert’s theory or technique; whether the technique has been subjected to peer review and/or publication; the known or potential rate of error; and whether the technique or methodology is generally accepted by the scientific community. See Daubert, 509 U.S. at 593-594, 113 S.Ct. at 2796-2797. This list of factors is meant to be helpful, not definitive. Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 151, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999).[18] The Loui *355 siana Supreme Court adopted the Daubert analysis in State v. Foret, 628 So.2d 1116 (La.1993).
The factual basis for an expert’s opinion determines the reliability of the testimony. An unsupported opinion can offer no assistance to the fact finder and should not be admitted as expert testimony. Miramon v. Bradley, 96-1872 (La. App. 1st Cir.9/23/97), 701 So.2d 475, 478. The trial court’s inquiry must be tied to the specific facts of the particular case. The abuse of discretion standard applies to the trial court’s ultimate conclusion as to whether to exclude expert witness testimony and to the court’s decision as to how to determine reliability. Brown v. City of Madisonville, 2007-2104, p. 7 (La.App. 1st Cir.11/24/08), 5 So.3d 874, 881, writ denied, 2008-2987 (La.2/20/08), 1 So.3d 498.
It is important to note, however, that there is a crucial difference between questioning the methodology employed by an expert witness and questioning the | ^application of that methodology or the ultimate conclusions derived from that application. Only a question of the validity of the methodology employed brings Daubert into play. MSOF Corporation v. Exxon Corporation, 2004-0988, p. 12 (La.App. 1st Cir.12/22/05), 934 So.2d 708, 718, writ denied, 2006-1669 (La.10/6/06), 938 So.2d 78. Additionally, Daubert concerns admissibility of the expert’s opinion and not his qualifications as an expert in the area tendered. Id. If a trial court conducts no Daubert analysis of any kind, the exclusion of the expert’s evidence without an evaluation of the relevant reliability factors is legal error. See Corkern, 2004-2293 at pp. 6-7, 934 So.2d at 107.
Although we briefly summarized Dr. Mark’s opinion hereinabove, we will now carefully examine the January 21, 2010 affidavit (“the affidavit”) of Dr. Mark. According to the affidavit, Dr. Mark was asked to review the case of Harris Robertson and authored a letter (or expert report) dated August 5, 2008, which was attached as an exhibit to the affidavit. Based on his review of the material, he concluded that Harris Robertson was diagnosed with malignant mesothelioma. As stated in his expert report, Dr. Mark concluded that based on the exposure history, “all special exposures to asbestos contributed to and caused this lethal diffused malignant mesothelioma.” Further, in his opinion, all of Harris Robertson’s “special exposures to asbestos were significant contributing factors in the development of his diffused malignant mesothelioma.”
Dr. Mark stated that all of his statements in his expert report and in his affidavit were made with a reasonable degree of medical certainty, were based on his knowledge, experience and training, and were based on the materials described in the affidavit. He further stated that the facts stated in the affidavit were sufficient to form a reliable basis for his opinion, that he was familiar with all of the literature cited in the affidavit that were used to formulate his medical opinions in the case, and that the methodology and basis for his opinibns were not novel and l^were generally accepted in the medical and scientific community.
Dr. Mark stated that in formulating his opinion in this case, he reviewed: defense expert reports received by counsel for the plaintiffs, Harris Robertson’s medical and billing records, the deposition testimony of Bobby Robertson, Harold Robertson, Raymond Robertson, Frances Robertson, and *356 Octave Otto Gutekunst, and medical studies and literature further detailed in the affidavit.
According to these materials, it was his understanding that Harris Robertson was a career drywall finisher and painter (in residential construction) from the early 1960s through the time of his diagnosis; that the entire drywall finishing process, including the mixing of the dry joint compound, the application of mud, the sanding of the mud, and the clean-up process, was very dusty; and that Harris Robertson and his brothers routinely or mainly used Gold Bond, Welcote, and Georgia-Pacific joint compound (or sheetrock mud). Additionally, he stated that in reaching his opinions, he took into account Harris Robertson’s use of a dust mask and respirator during the course of his drywall finishing work.
Dr. Mark emphasized in his affidavit that he did “not believe that exposure to a single asbestos fiber can cause mesothelio-ma or any other asbestos related disease” but rather it was his opinion that “every special exposure to asbestos contributes to cause mesothelioma.” In determining the relative. contribution of any exposure to asbestos, Dr. Mark stated that it is important to consider a number of factors, including, but not limited to: the nature of exposure, the level of exposure and the duration of exposure, whether a product gives off respirable asbestos fibers, whether a person was close or far from the source of fiber released, how frequently the exposure took place, how long the exposure lasted, whether engineering or other methods of dust control were in place, whether respiratory protection was used, the chemistry and physics of asbestos fibers, the pathophysiology of breathing, the movement of asbestos fibers in the lung, the Igümolecular pathology of tumor development, and other scientific disciplines. Additionally, he stated that the “dose response model” for risk assessment has been used by OSHA, NIOSH, and other governmental entities for more than two decades, and that he relied upon the attribution criteria espoused in the “Consensus Report, Asbestos, Asbestosis, and Cancer: The Helsinki Criteria for Diagnosis and Attribution, Scan J. Work Environ Health, 23:311-6 (1997) as applied to the factual evidence” of Harris Robertson’s exposures.
Additionally, in Dr. Mark’s affidavit, he explained that diffuse malignant mesotheli-oma is a dose response disease — the more someone is exposed to asbestos, the greater their risk for development of the disease. He stated that he believes there is a dose response relationship between the amount of asbestos to which an individual is exposed and the risk of developing mesothelioma and that this concept is generally accepted in the medical and scientific communities. He further explained that because asbestos dust is so strongly associated with mesothelioma, proof of significant exposure to asbestos dust is proof of specific causation, that the causal relationship between exposure to asbestos dust and the development of mesothelioma is so firmly established in the scientific literature that it is “accepted as a scientific ‘fact,’ ” and that diffuse malignant meso-thelioma is known as a “Signal Tumor” for asbestos exposure and indicates prior asbestos exposure, even when the victim cannot recall the exposure which may have occurred years previously or may not have been apparent at the time. Dr. Mark stated that it was his opinion that diffuse malignant mesothelioma is a dose response disease and that the resulting disease is the cumulative result of the exposures to asbestos that a person receives.
Dr. Mark explained that the exposures to asbestos described by Harris Robert *357 son’s co-workers (brothers) were not low dose exposures, as the exposures they described in their depositions were high level exposures that occurred for 12r,prolonged periods of time, and that each exposure to asbestos-containing dust from the use of products, above background levels, contributes to cause diffuse malignant meso-thelioma.
Dr. Mark then concluded that it was his opinion with a reasonable degree of medical certainty that the ongoing exposure to dust from asbestos-containing finishing products, including joint compound, as described by Harris Robertson’s co-workers (brothers), and such cumulative exposures from Harris Robertson’s work with and around such products substantially contributed to the development of his malignant mesothelioma. Dr. Mark also specifically opined that to the extent that the Gold Bond, Welcote, and Georgia-Pacific products contained asbestos, Harris Robertson’s exposure to those finishing products was a substantial contributing factor in his development of malignant mesotheli-oma. Lastly, Dr. Mark noted that his opinions with regard to the specific causation of Harris Robertson’s malignant mesothelioma were based on his review of the evidence of exposure in this case, the medical and scientific literature cited in the affidavit concerning asbestos exposure and disease, and his knowledge, skill, experience and training as a physician who has studied in asbestos diseases for over four decades.[19]
The Louisiana Legislature recently amended La. C.C.P. art. 1425 to set out exactly what is required from the parties and the court when conducting a hearing under Daubert and ruling on the admissibility of an expert’s proffered testimony. See 2008 La. Acts, No. 787 § 1. This article contains the following pertinent provisions:
F. (1) Any party may file a motion for a pretrial hearing to determine whether a witness qualifies as an expert or whether the methodologies employed by such witness are reliable under Articles 702 through 705 of the Louisiana Code of Evidence. The motion | ¡>7shall be filed not later than sixty days prior to trial and shall set forth sufficient allegations showing the necessity for these determinations by the court.
(2) The court shall hold a contradictory hearing and shall rule on the motion not later than thirty days prior to the trial. At the hearing, the court shall consider the qualifications and methodologies of the proposed witness based upon the provisions of Articles 104(A) and 702 through 705 of the Louisiana Code of Evidence. For good cause shown, the court may allow live testimony at the contradictory hearing.
(8) If the ruling of the court is made at the conclusion of the hearing, the court shall recite orally its findings of fact, conclusions of law, and reasons for judgment. If the matter is taken under advisement, the court shall render its ruling and provide written findings of fact, conclusions of law, and reasons for judgment not later than five days after the hearing.
(4) The findings of facts, conclusions of law, and reasons for judgment shall be made part of the record of the proceedings. The findings of facts, conclusions of law, and reasons for judgment shall specifically include and address:
(a) The elements required to be satisfied for a person to testify under Arti- *358 cíes 702 through 705 of the Louisiana Code of Evidence.
(b) The evidence presented at the hearing to satisfy the requirements of Articles 702 through 705 of the Louisiana Code of Evidence at trial.
(c) A decision by the judge as to whether or not a person shall be allowed to testify under Articles 702 through 705 of the Louisiana Code of Evidence at trial.
(d) The reasons of the judge detailing in law and fact why a person shall be allowed or disallowed to testify under Articles 702 through 705 of the Louisiana Code of Evidence.
(5) A ruling of the court pursuant to a hearing held in accordance with the provisions of this Paragraph shall be subject to appellate review as provided by law.
At the hearing on the motion to strike, Sherwin-Williams did not offer any testimony, affidavits, or other admissible evidence to contradict or to question the reliability of any of the statements contained in Dr. Mark’s affidavit. In fact, the only evidence offered by Sherwin-Williams in support of its motion to strike were Lathe exhibits attached to its memorandum in support of the motion,[20] which consisted of the following: uncertified copies of judgments or rulings from other trial courts — one from Louisiana (the Civil District Court for Orleans Parish) and two from other states — that similarly limited the opinions of experts in unrelated asbestos disease cases;[21] the letter (or expert report dated August 5, 2008) of Dr. Mark concerning Harris Robertson; several medical articles or reports relating to industrial and construction workers; “A Biopersistance Study” sponsored by a grant from Georgia-Pacific relating to asbestos exposure; a carcinogenic study of amphiboles; an excerpt of the deposition testimony of Elizabeth Gilbert in an unrelated asbestos disease case; and a copy of a 1977 news release from the United States Consumer Product Safety Commission (“CPSC”) announcing the ban of asbestos-containing joint compounds, on the basis that the asbestos fibers released into the air from those products created a health risk.[22]
Although the trial court ultimately concluded that Dr. Mark’s opinion on cau *359 sation was not reliable, neither the trial court’s reasons for judgment nor the |2ajudgment itself conform to the requirements of La. C.C.P. art. 1425 or reflect that an analysis of the Daubert factors was made. This was legal error. See Corkern, 2004-2293 at pp. 6-7, 934 So.2d at 107. Although Sherwin-Williams offered the attachments to its memorandum into evidence, none of this “evidence” specifically ties in to the facts of this case or establishes that Dr. Mark’s opinion on specific or medical causation in this case is unreliable. As noted above, the trial court’s Daubert inquiry must be tied to the specific facts of the particular case. See Brown, 2007-2104 at p. 7, 5 So.3d at 881.
While we recognize that the trial court concluded that Dr. Mark lacked a foundation to offer an opinion on causation, had no epidemiology studies to rely on, and did not know what the dose of asbestos would have been as to any particular defendant, there is no factual evidence in the record before us to support any of these conclusions. For instance, there is no evidence as to whether Dr. Mark did or did not rely on epidemiology. In this regard, we cannot find, nor have we been directed to, any authority for the trial court’s determination that epidemiological evidence is required to establish causation of an individual’s disease. Absent such authority, we must conclude that such evidence is not necessary. See Warren v. Sabine Towing and Transportation Company, Inc., 2001-0573, pp. 10-12 (La.App. 3rd Cir.10/30/02), 831 So.2d 517, 527-528, writs denied, 2002-2926, 2002-2927, 2002-2936 (La.2/14/03), 836 So.2d 116, 117 (con-eluding that epidemiological evidence linking benzene to myeloproliferative disorder was not necessary to establish that the plaintiffs occupational exposure to benzene caused his disorder) and c.f. Sharkey v. Sterling Drug, Inc., 600 So.2d 701, 712 (La.App. 1st Cir.), writs denied, 605 So.2d 1099, 1100 (La.1992) (noting that proof of causation, based in part on epidemiological studies as the basis for expert opinion, “is allowed”). Additionally, there is no evidence in the record as to whether Dr. Mark knew or did not know the dose as to any particular defendant. |30On this issue, again, we cannot find, nor have we been directed to, any authority for the trial court’s determination that a plaintiff must prove or that an expert must know the “dose” of asbestos as to each particular defendant in order to establish causation. Rather, based on our review of the jurisprudence, the plaintiff is only required to show “significant exposure to the [asbestos-containing] product complained of to the extent that it was a substantial factor in bringing about his injury.” Rando, 2008-1163 at p. 35, 16 So.3d at 1091.
Therefore, based on the record before us, we must conclude that Sherwin-Williams failed to prove that Dr. Mark’s opinions on specific or medical causation were unreliable, and in the absence of such evidence or any analysis of the Daubert factors, we must conclude that the trial court legally erred in granting Sherwin-Williams’ motion to strike. Accordingly, the February 23, 2010 judgment of the trial court in this regard is reversed.[23]
CONCLUSION
For all of the above and foregoing reasons, the February 23, 2010 judgment of *360 the trial court granting Sherwin-Williams’ motion to strike the testimony of Dr. Eugene J. Mark is reversed and the April 5, 2011 judgment of the trial court granting Sherwin-Williams’ motion for new trial and granting Sherwin-Williams’ motion for summary judgment is reversed. This matter is remanded to the trial court for further proceedings.
All costs of this appeal are assessed to the defendant/appellee, The Sherwin-Williams Company.
FEBRUARY 23, 2010 JUDGMENT REVERSED; APRIL 5, 2011 JUDGMENT REVERSED; REMANDED.
McCLENDON, J., concurs and assigns reasons.

. Georgia-Pacific was named as a defendant in the plaintiffs’ original petition, but on April 22, 2008, was dismissed without prejudice. However, Georgia-Pacific was added as a defendant again in the plaintiffs’ first supplemental and amended petition filed on November 25, 2008. See footnote 4.

. In two companion cases also rendered this date, the plaintiffs separately appealed the trial court’s grant of summary judgment in favor of Georgia-Pacific (Robertson v. Doug Ashy Building Materials, Inc., 2010-1547 (La. App. 1st Cir. 10/4/11), 77 So.3d 323) and in favor of Union Carbide (Robertson v. Doug Ashy Building Materials, 2010-1551 (La.App. 1st Cir.10/4/11) 77 So.3d 360). On December 3, 2010, this court denied the defendants' motion to consolidate these related appeals, but ordered that the appeals be placed on the same docket and assigned to the same panel. Robertson v. Doug Ashy Building Materials, 2010-1552 (La App. 1st Cir. 12/3/10)(unpub-lished action).

. The plaintiffs subsequently filed a first supplemental and amended petition on November 25, 2008, for the sole purpose of adding additional defendants who were identified during discovery proceedings, including Le-vert-St. John LLC ("Levert-St. John”). On May 19, 2009, the plaintiffs filed a second supplemental and amended petition for the purpose of specifically pleading the plaintiffs' claims against the defendants added in the first supplemental and amended petition. In this appeal, no issues have been raised with regard to those defendants or claims.

. Louisiana Code of Civil Procedure article 1602 provides: "A continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance.”

. Thereafter, both Georgia-Pacific and Union Carbide filed a motion seeking the same relief.

. Sherwin-Williams also filed a motion for summary judgment on December 18, 2009, seeking dismissal from this action on the basis that it was merely an alleged retailer of products that other companies manufactured (that it was a “non-manufacturing seller”) and that there was no evidence to support a finding of fault related to these retail sales, or alternatively partial summary judgment dismissing the claims arising out of its retail sales. This "non-manufacturing seller” motion for summary judgment was also denied by the judgment rendered on January 19, 2010, and signed on February 2, 2010. No issues have been raised in this appeal with regard to the non-manufacturing seller motion for summary judgment.

. Both Union Carbide and Georgia-Pacific joined with Sherwin-Williams in opposing the plaintiffs' motion for new trial.

. At the hearing, the trial court initially denied the motion for new trial, but subsequently during the hearing, it decided to grant both the motion for new trial and the motion for summary judgment.

. The April 6, 2010 judgment lacked appropriate decretal language. Accordingly, on March 14, 2011, this court issued an interim order remanding this matter for the limited purpose of having the trial court sign a valid written judgment that included appropriate decretal language as required by La. C.C.P. art. 1918 and to have the record supplemented with the new judgment. See Robertson v. Doug Ashy Building Materials, Inc., 2010-1552 (La.App. 1st Cir.3/14/11) (unpublished action).

. Although the judgments granting the motion to strike the testimony of Dr. Mark and denying the plaintiffs' motion for new trial on the motion to strike are interlocutory, nonap-pealable judgments, see La. C.C.P. arts. 1841 and 2083, when an appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him in addition to the review of the final judgment. See Judson v. Davis, 2004-1699, p. 8 (La.App. 1st Cir.6/29/05), 916 So.2d 1106, 1112-1113, writ denied, 2005-1998 (La.2/10/06), 924 So.2d 167. Thus, in this case, we can consider the correctness of those interlocutory judgments in conjunction with the appeal of the judgment granting Sherwin-Williams' motion for summary judgment, which is a final and ap-pealable judgment. See Ballard v. Waitz, 2006-0307, pp. 4-5 (La.App. 1st Cir. 12/28/06), 951 So.2d 335, 338, writ denied, 2007-0846 (La.6/15/07), 958 So.2d 1193; People of Living God v. Chantilly Corporation, 251 La. 943, 947-948, 207 So.2d 752, 753 (1968).

. A fact established by direct evidence is one which has been testified to by witnesses as having come under the cognizance of their senses. Rondo, 2008-1163 at p. 33, 16 So.3d at 1090. Circumstantial evidence, on the other hand, is evidence of one fact or a set of facts, from which the existence of the fact to be determined may reasonably be inferred. Id.

. At oral argument and in its brief, Sherwin-Williams claimed that it raised this issue on page 6 of its memorandum in support of its motion for summary judgment. However, a memorandum, opposition or brief is not a pleading, see Vallo v. Gayle Oil Company, Inc., 94-1238 (La.11/30/94), 646 So.2d 859, 865, and therefore, raising the issue in a memorandum is not the equivalent of raising the issue in an actual pleading or motion. Nevertheless, after thoroughly reviewing Sherwin-Williams’ memorandum in support of its motion for summary judgment, we still conclude that whether the plaintiffs would be unable to establish that the exposure to the asbestos-containing products purchased at (or sold by) Sherwin-Williams caused or was a substantial factor in bringing about Harris Robertson’s mesothelioma was neither raised as an issue before the court nor was the issue briefed.

. Raising an issue in a motion for new trial on a motion for summary judgment is not the equivalent of raising the issue in the underlying motion for summary judgment or of raising the issue in a new motion for summary judgment. That is because the procedure in a motion for new trial does not necessarily afford the parties the opportunity to support and oppose the motion with proof, as in a motion for summary judgment. Furthermore, even if we could construe the motion for new trial as a new motion for summary judgment on the issue of “substantial cause,” we find Sherwin-Williams failed to properly support its assertion that there was an absence of factual support to establish that the exposure to the asbestos-containing products purchased at (or sold by) Sherwin-Williams caused or was a substantial factor in bringing about Harris Robertson’s mesothelioma. Given the universally recognized causal connection between asbestos exposure and mesothe-lioma, together with the fact that Sherwin-Williams offered no evidence in support of its motion to show that Harris Robertson’s exposures were not medically significant or that they did not have a medical causation expert on this issue, Sherwin-Williams' unsupported motion did not shift the burden to the plaintiffs to demonstrate at the summary judgment stage, that the exposures on which it was relying on were medically significant. See Coleman v. St. Tammany Parish School Board, 2008-1979, 2008-1980, p. 6 (La.App. 1st Cir.5/8/09), 13 So.3d 644, 648; Pugh v. St. Tammany Parish School Board, 2007-1856, pp. 4-6 (La.App. 1st Cir.8/21/08), 994 So.2d 95, 98-100, writ denied, 2008-2316 (La.11/21/08), 996 So.2d 1113.

. We note that Sherwin-Williams also offered the affidavit of Allison Juge in support of this contention. According to this affidavit, Allison Juge stated that she personally went to the library at the University of Louisiana and photocopied certain sections of the original telephone directories for Lafayette and New Iberia for certain years in the 1960s, 1970s and 1980s, and that attached to her affidavit were true and correct copies of the telephone directories. The documents attached to her affidavit appear to be a copy of the front cover of the 1965 phone book for Lafayette and a copy of the "yellow pages” for the listing "Paint-Retail.” With this affidavit and the attached documents as support, Sherwin-Williams claimed there was an absence of factual support establishing that Sherwin-Williams owned the stores that sold Harris Robertson asbestos-containing products since the "yellow pages” reflected that there was only one Sherwin-Williams "branch” (company owned store) and several Sherwin-Williams "dealers” (independent stores). However, such factual assertions were not based on Allison Juge’s personal knowledge, and therefore, we conclude that her affidavit and the documents attached thereto were not competent summary judgment evidence, see La. C.C.P. art. 967(A), and will not be considered by this court on de novo review.

. The plaintiffs also asserted that there were genuine issues of material fact as to whether Harris Robertson’s purchase and inhalation of asbestos-containing joint compound from Sherwin-Williams was a substantial contributing factor in his development of mesothelio-ma, and in support of its contention in this regard, it offered an unsigned "draft” of the "affidavit” of Dr. Mark. An unsigned "draft” of an affidavit is not an affidavit at all, see La. C.C. art. 1833, and as such, is not competent summary judgment evidence, see La. C.C.P arts. 966 and 967. However, as previously noted, since the issue of medical causation or "substantial cause” was not raised in Sher-win-Williams’ motion for summary judgment, we need not consider the plaintiffs' opposition and supporting proof (or lack thereof) with regard to this issue.

. We find it interesting to note that Sher-win-Williams specifically relied on and quoted the deposition testimony of Dr. Mark in opposing a motion for summary judgment filed by another defendant, Levert-St. John.

. In Kumho Tire Company, 526 U.S. at 141, 119 S.Ct. at 1171, the United States Supreme Court held that the Daubert standard governing the admissibility of expert evidence ap *355 plied not only to testimony based on "scientific'’ knowledge, but also to testimony based on "technical” and “other specialized knowledge.”

. We recognize that Dr. Mark’s opinions on specific causation are similar in nature to the expert opinion testimony set forth in Rando, 2008-1163 at pp. 36-37, 16 So.2d at 1091-1092.

. Generally, we note that documents attached to memoranda do not constitute evidence and cannot be considered as such on appeal. Denota v. Vessel Management Services, Inc., 2007-2143, p. 6 (La.5/21/08), 983 So.2d 84, 88. Furthermore, evidence not properly "offered and introduced cannot be considered, even if it is physically placed in the record." Id. However, in this case, Sherwin-Williams specifically "offer[ed] into evidence the exhibits to [its] motion,” and although the record does not reflect that the trial court accepted those documents into evidence, the plaintiffs made no objection to that introduction of evidence at the trial court or in this court.

. Further, the record does not indicate whether these judgments or rulings from other trial courts, which are interlocutory in nature, are now final and definitive. See La. C.C.P. arts. 1841, 2083, 2166, and 2167.

.It appears that this news release actually supports the position of the plaintiffs. According to this document, the CPSC banned consumer patching compounds containing asbestos on the basis that certain types of cancer could result from inhaling free-form asbestos fibers released into the air during the use of the products. Although the news release acknowledged that the asbestos content of a given product was not necessarily the sole criterion for that product's relative health risk, it determined that a health risk occurred when asbestos fibers became airborne and then inhaled. The news release noted that consumer patching compounds were available in dry form (to be mixed with water by the user) or in a ready mix paste form and were used to cover, seal, or mask cracks, joints, holes, and similar openings in the trim walls and ceilings of building interiors. The news release further noted that asbestos fibers *359 were released into the air after application, when the patching compounds was sanded or scraped in the process of finishing or smoothing the surface, and also when the dry form of the patching compound was mixed with water prior to use.

. Based on our ruling herein, all issues relating to the denial of the plaintiffs’ motion for new trial on the motion to strike (the April 6, 2010 judgment) are moot.