WELCH, J.
^Plaintiffs, Frances Robertson, Phillis Castille, Leslie Robertson, and Stewart Roberston, appeal a trial court judgment granting summary judgment in favor of defendant, Union Carbide Corporation (Union Carbide), dismissing their survival and wrongful death claims. We reverse and remand for further proceedings.
BACKGROUND
On June 30, 2004, Harris Robertson (Harris) was diagnosed with mesothelioma and died from the disease on November 27, 2004. On May 26, 2005, plaintiffs, Harris’ wife and children, filed this lawsuit against a host of defendants seeking to recover damages allegedly resulting from Harris’ exposure to asbestos-containing products while working as a sheetrock installer, which plaintiffs claimed caused Harris’ fatal disease. Three of the defendants in the litigation are Union Carbide, Georgia-Pacific, LLC (Georgia-Pacific), and The Sherwin-Williams Company (Sherwin-Williams).[2] Plaintiffs averred that Georgia-Pacific manufactured and Sherwin-Williams sold the asbestos-containing products to which Harris had been exposed. They premised liability against Union Carbide as the alleged supplier of raw asbestos used to manufacture the products to which Harris had been exposed. Specifically, plaintiffs alleged that from 1960-1970, while doing sheetrock installation work for V.P. Pierret Construction Company, Harris had been regularly exposed to asbestos and asbestos-containing products present in joint compounds utilized during the sheetrock finishing process. As a result of such exposure, plaintiffs averred, the asbestos dust and fibers became airborne, landing on Harris’ clothing, and were inhaled or otherwise ingested by |4him. Plaintiffs claimed that Harris’ exposure to asbestos-containing products caused his mesothelioma.
*363 On December 18, 2009, Union Carbide filed a motion for summary judgment. Therein, it asserted that plaintiffs failed to meet their burden of establishing legal causation because they had no evidence to support a finding that Harris encountered any Union Carbide asbestos, let alone, frequent and regular exposure to Union Carbide asbestos, so that such exposures could be found to constitute a substantial contributing factor in the development of Harris’ mesothelioma. Union Carbide insisted that at best, plaintiffs could only speculate that the joint compound materials allegedly used by Harris may have contained asbestos generally; however, they are unable to prove that it was Union Carbide asbestos in any particular joint compound that Harris may have used. Thus, Union Carbide argued, plaintiffs had no evidence to link the joint compounds they claimed Harris was exposed to or the speculative existence of asbestos in those materials to Union Carbide.
In support of its motion for summary judgment, Union Carbide attached excerpts of the depositions it claimed demonstrated a lack of evidence of Harris’ exposure to asbestos-containing joint compounds. Union Carbide posited that all of the witnesses testified in a uniform and consistent manner that they had no information indicating Harris ever worked with asbestos-containing joint compound and that its summary judgment evidence further demonstrated that Harris wore a respirator, and, therefore, could not have encountered any asbestos during the drywall finishing process.
Frances Robertson, Harris’ wife, testified that she was unable to answer where Harris was working when he was exposed to asbestos and that she never spoke with her husband regarding asbestos exposure. She stated that she believed sheetrock mud products used by Harris contained asbestos. Raoul “Bobby” | .¡Robertson, who, like Harris, owned his own drywall business, also was unable to identify any specific products used on the job that may have contained asbestos. Ray Montgomery, a contractor for whom Harris did sheetrock and painting jobs on homes during a five to ten-year period, could not identify any type of joint compound Harris may have used on the job that contained asbestos and was unable to identify any joint compound product Harris may have used on the jobs. Lastly, Glynn Pierret testified that he could not identify specific joint compounds that his father’s construction company, V.P. Pierret Construction, may have used on jobs prior to his father’s death.
Bobby testified that he and Harris worked together on occasion on drywall jobs during the 1960s and 1970s in the Lafayette area when work in their own businesses was slow. He explained that during the drywall process, the sheets of drywall were taped at the joints and then “floated” by several applications of sheet-rock mud or plaster over the tape with a trowel. After the mud or plaster dried, the area was sanded by hand with sandpaper. Bobby said that he and his brother did not wear any respiratory protection during the floating process, but did while sanding, noting that he put a wet towel or handkerchief over his face to keep the dust out of his nose and mouth, and Harris used a mask with filters while sanding and while mixing the powders to make the sheetrock mud.
Harold Robertson, who also worked with Harris on drywall jobs, testified that Harris always wore a paper dust mask or a respirator while mixing and sanding the joint compound and while cleaning up the work area. He stated that while sanding, the respirator clogged up so often that Harris would just wear the mask. Harold *364 recalled having used Gold Bond, Welcote, and Georgia-Pacific joint compound powders on the jobs, but did not know whether any of the products contained asbestos. Harold could not recall the specific jobs or locations where each of the types of sheet-rock muds had been used, but only had a general | r,recollection that they had been used at some time. Raymond Robertson, who also worked with Harris on sheetrock jobs, recalled Harris having worn dust masks or respirators while doing his work.
In its motion for summary judgment, Union Carbide further asserted that it owed no duty to Harris, as it sold its unique, short-fiber raw chrysotile asbestos to sophisticated product manufacturers and purchasers. It posited that as a matter of law, no duty exists between a raw materials distributor, through several layers of sophisticated users, to an ultimate user/purchaser, or employee of the ultimate user/purchaser company.
In response to the motion for summary judgment, plaintiffs offered deposition testimony of Harris’ co-workers, which they claimed demonstrated that: (1) Harris used Gold Bond finishing products throughout the 1960s and 1970s, which had been manufactured by National Gypsum Company and contained Union Carbide asbestos; (2) Harris worked with Georgia-Pacific products from approximately 1970 through the early 1980s; and (3) Harris breathed dust from each aspect of his work with these finishing products, from mixing to clean-up. Plaintiffs asserted that based on this testimony alone, a genuine issue of material fact exists as to whether Harris was exposed to Union Carbide asbestos through his use of Gold Bold finishing products and finishing products manufactured by Georgia-Pacific.
The deposition excerpts offered by plaintiffs contained more detailed information regarding prior work histories and the sheetrock finishing process. Harold, who worked with Harris for two painting contractors on numerous jobs beginning in the 1960s through the 1970s, recalled having used Georgia-Pacific, Gold Bond, and Wel-cote sheetrock muds. He stated that the Georgia-Pacific sheetrock mud was in 20-pound bags that were blue and white and that they probably also used Georgia-Pacific texture materials on the jobs. Harold also 1 vindicated that the joint compound used most often when he worked with Harris in the Baton Rouge area was Gold Bond when it was available in the ready-mix form.
Raymond, who worked with Harris doing sheetrock work and painting for two different contractors from 1968 through the 1970s for approximately eight to nine years, was shown pictures of products and asked to identify the various finishing products that had been used on the jobs. He identified four Gold Bond finishing products and a Georgia-Pacific finishing product called “Speed Set Vinyl Gypsum Adhesive Quick Setting Joint Compound,” a pre-mixed product, which they used instead of regular mud joint compound when time was an issue because it dried faster.
Regarding the issue of whether Harris had any exposures to the finishing products, Harold testified that he and Harris usually worked in the same room and that typically he worked on the ceiling and Harris worked on the walls. He testified that he and Harris mixed the powdered joint compounds with water in buckets, cleaned-up product that had fallen on the floor by allowing it to dry and then sweeping it, and cleaned the area after sanding. Harold acknowledged that the entire process, from mixing, sanding, and sweeping up, was a very dusty process, and that they would breath in the dust. Raymond testified that it took approximately 10 minutes to mix powdered sheetrock mud, and *365 that upon pouring the product in and starting the mixing process, it would be dusty and they would breathe in the dust. Bobby also described the dusty nature of the mixing and sanding process, adding that he and Harris sanded the ceiling areas, during which they would get dust all over themselves, including in their noses and mouths. He stated that Harris sanded the ceiling with sandpaper and wore a mask and he had tried that method, but found that putting a towel over his face worked better to keep the dust out of his nose and mouth. Bobby only recalled having purchased | sGold Bond sheetrock mud for the jobs and did not recall ever using any Georgia-Pacific products while doing the sheetrock work.
Plaintiffs also offered evidence in support of their claim that more probably than not, the Georgia-Pacific finishing products utilized by Harris contained Union Carbide asbestos, asserting it is virtually unquestionable that Georgia-Pacific’s sheetrock finishing products contained asbestos through 1977. They offered photographs of Georgia-Pacific products and Georgia-Pacific’s answers to interrogatories in response to a question asking it to identify the products it manufactured that contained asbestos. In the answers to interrogatories, Georgia Pacific stated that Bestwall, a company it acquired in 1965, had manufactured a limited line of asbestos-containing drywall finishing products beginning in July of 1956. Georgia Pacific did not manufacture such products until it acquired Bestwall in April of 1965, and by 1977, Georgia-Pacific ceased the manufacture of all such products. It identified specific asbestos-containing drywall finishing products, providing detailed information on each, including, among others, “All Purpose Joint Compound,” “Joint Compound,” “Ready Mix,” and “Speed Set/One Day.” According to Georgia Pacific, the product “Ready Mix” was first sold by Bestwall in 1963 and Georgia-Pacific continued to manufacture it after 1965. In 1973 or 1974, Georgia-Pacific introduced an asbestos free formula; however, the availability of asbestos and asbestos-containing formulations may have varied from state to state from 1973 to 1977, the last year that asbestos-containing “Ready Mix” was manufactured. Georgia Pacific provided similar details for its other asbestos-containing drywall finishing products.
In the interrogatories, Georgia-Pacific was asked to identify the supplier of the asbestos used in its asbestos-containing products. Georgia-Pacific responded that from 1964 through 1974, it used chrysotile asbestos pellets, believed to have been supplied by Union Carbide, |sas an additive to certain paperboard products and as an additive in one of its industrial resins, stating that its investigation into the nature of the resin was ongoing. It further stated that it purchased raw asbestos fibers for use in the manufacture of its limited number of asbestos-containing products primarily from Johns-Manville, Union Carbide, and Phillip Carey, but may have purchased raw asbestos fibers from other companies from time to time.
In further opposition to the motion for summary judgment, plaintiffs offered the deposition of Oliver Burch, taken in connection with another lawsuit, in which Burch admitted that all of Georgia-Pacific’s joint compound products manufactured and sold from approximately 1965 through 1972 contained asbestos, although he was not certain of the exact dates. Burch also admitted that as late as the first quarter of 1977, over 74 percent of the joint compound that Georgia-Pacific shipped contained asbestos. Plaintiffs submitted a host of Union Carbide invoices referencing the sale of asbestos to Georgia-Pacific and Georgia-Pacific purchase orders referencing the purchase of asbestos from Union *366 Carbide from 1970 through 1977. Plaintiffs also offered a Union Carbide brochure discussing the use of Calidria asbestos for tape joint compound formulations, as well as the testimony of John Meyers and William Thurbur, taken in connection with another lawsuit, wherein the witnesses acknowledged that the joint compound product market was one of the major market sectors that Union Carbide aimed for with its Calidria asbestos and that Union Carbide asbestos had been sold to that market.
On the issue of causation, plaintiffs argued that the court could not rule, as a matter of law, that Harris’ exposures to Union Carbide asbestos were not a substantial contributing factor in causing his mesothelioma. Plaintiffs pointed out that the jurisprudence recognizes that mesothe-lioma can develop from relatively short, high intensity exposure to asbestos. Therefore, plaintiffs asserted, any suggestion that the court could rule on the significance of any exposure to asbestos, as a matter of law, is simply contrary to Louisiana jurisprudence. Moreover, they [ )nargued, whether Harris’ exposures were a substantial factor in bringing about his disease is a factual question that should be decided by a jury, and is not a question on which the court could make a ruling on a motion for summary judgment.[3]
Plaintiffs also filed a separate response to Union Carbide’s motion for summary judgment on the issue of sophisticated users and purchasers. Plaintiffs argued that the sophisticated user doctrine is inapplicable because Union Carbide asbestos is unreasonably dangerous. Furthermore, they asserted, it is established that there is an almost universal duty on the part of a defendant in a negligence case to avoid injury to another, and Union Carbide failed to articulate this unquestionable rule of law with sufficient clarity to eliminate plaintiffs’ claims against Union Carbide. Union Carbide filed a reply memorandum on the issue of sophisticated users and purchasers, asserting that its Calidria asbestos is not unreasonably dangerous per se and that it fulfilled its duty by selling the raw asbestos to Georgia Pacific or National Gypsum in bags with warning labels on it. Union Carbide insisted that it had no duty, and no ability, to warn Harris, the final end user of the product, of the dangers of asbestos. It also claimed that plaintiffs’ assertion that its asbestos was unreasonably dangerous per se was refuted by Dr. Victor Louis Roggli, an expert retained by plaintiffs, attaching an excerpt of Dr. Roggli’s 2009 telephonic deposition taken in connection with another lawsuit, in which the doctor expressed his opinion that Calidria asbestos does not contribute to the potential development of mesothelio-ma.
During the course of the litigation, Sher-win-Williams filed a motion to strike portions of the opinion of plaintiffs’ expert pathologist, Dr. Eugene Mark, whose expert opinion plaintiffs intended to rely on to establish that Harris’ exposure to asbestos-containing joint compounds purchased at or sold by Sherwin-Williams |nwas a substantial factor in bringing about or causing Harris’ mesothelioma. In its motion to strike, Sherwin-Williams moved for an order precluding Dr. Mark from offering what it claimed to be “unreliable testimony” that any fiber or every exposure above background was a substantial con *367 tributing factor in causing Harris’ disease. Union Carbide joined in that motion to strike.
The hearing on the various motions for summary judgment was set for January 19, 2010. On that date, two hearings were held. At the first hearing, Sherwin-Williams’ motions for summary judgment and motion to strike a portion of Dr. Mark’s testimony were heard. Plaintiffs moved for a continuance, urging that some of the defendants in the litigation had moved for summary judgment on the issue of causation and despite their best efforts, plaintiffs had not been able to obtain a final, notarized copy of Dr. Mark’s causation affidavit to file in response to the various motions for summary judgment. Plaintiffs explained that Dr. Mark, who had been deposed on January 7, 2010, was contacted the next day and asked to review the evidence to determine which exposures he considered to be substantial contributing factors in causing Harris’ disease in anticipation of the defendants filing motions to address causation issues, but received no response to repeated requests for such information prior to the hearing. Plaintiffs requested a continuance on each motion set for hearing that day that addressed the issue of causation and Dr. Mark’s opinions. The trial court denied plaintiffs’ motion for a continuance and granted Sherwin-Williams’ motion to strike a portion of Dr. Mark’s opinion to prohibit the doctor from offering testimony that any fiber or every exposure to asbestos above background was a substantial contributing factor in causing Harris’ disease. In so doing, the court found that there was no foundation supporting this opinion and that Dr. Mark had no knowledge of what dose of exposure was attributable to a particular defendant.
|12Later that afternoon, the court first heard and granted a motion for summary judgment'filed by Welco Manufacturing of Missouri, finding that defendant offered evidence that none of its products had come to Louisiana and the plaintiffs offered nothing in opposition to the motion. Immediately thereafter, plaintiffs moved for dismissal without prejudice of all claims against Georgia-Pacific and Union Carbide pursuant to La. C.C.P. art. 1671. That provision states that a “judgment dismissing an action without prejudice shall be rendered upon application of the plaintiff and upon his payment of all costs, if the application is made prior to any appearance of record by the defendant.” La. C.C.P. art. 1671. It further provides that if the application is made after an appearance by the defendant, the court may refuse to grant the judgment of dismissal except with prejudice. Id. Plaintiffs then stated that if the court was inclined to deny the request for dismissal without prejudice, the request would be withdrawn and the plaintiffs would continue with the remaining motions.
In response, Georgia-Pacific informed the court that it did not consent to a dismissal without prejudice and instead asked the court to dismiss the case with prejudice, urging that plaintiffs’ attorney had admitted at the earlier hearing that if he lost his expert, Dr. Mark, he could not prove a case against Georgia-Pacific. Union Carbide’s attorney echoed those statements, and also added that plaintiffs had no evidence and that both defendants should be dismissed with prejudice. Plaintiffs’ attorney started to address a point but declined to do so. Thereafter, the court granted Georgia-Pacific and Union Carbide’s motions to dismiss the lawsuits with prejudice, to which plaintiffs offered no objection. The court then heard an employer defendant’s motion for summary judgment, which plaintiffs did not oppose, and dismissed that defendant, finding there was no evidence of substantial expo *368 sure to asbestos during Harris’ employment.
_JjoOn January 29, 2010, plaintiffs filed a motion for a new trial on the grant of Georgia Pacific and Union Carbide’s motions to dismiss the lawsuits with prejudice and a motion for an expedited hearing on the request.[4] Therein, plaintiffs urged that it was procedurally improper for the trial court to dismiss the lawsuits with prejudice after plaintiffs had moved to dismiss the lawsuits under Article 1671, submitting that only a plaintiff could obtain a dismissal of a lawsuit pursuant to that provision and that a dismissal with prejudice could only be rendered if the plaintiff in fact consented to a dismissal with prejudice, which they did not.
When the case was called for trial on February 2, 2010, only one defendant, Sherwin-Williams, remained in the litigation. Plaintiffs moved to continue the trial on the basis of their procedural challenge to the dismissal of Georgia-Pacific and Union Carbide with prejudice at the January 19, 2010 hearing. The trial court stated that it did not dismiss the lawsuits against Georgia-Pacific and Union Carbide under Article 1671, but granted their motions for summary judgment and on that basis, dismissed the lawsuits against both entities with prejudice. The trial court set the plaintiffs’ motion for a new trial as to Georgia-Pacific and Union Carbide for March 2, 2010, to be heard with all pending motions filed by the plaintiffs and Sherwin-Williams challenging the trial court’s denial of Sherwin-Williams’ motion for summary judgment, the court’s refusal to grant a continuance at the January 19, 2010 hearing, and the court’s denial of plaintiffs’ motion to supplement the record with the affidavit of Dr. Mark.
On February 23, 2010, the trial court signed a judgment granting Georgia-Pacific’s motion to dismiss plaintiffs’ claims with prejudice. That judgment indicated that the dismissal had been made pursuant to Article 1671. The record does not contain a similar judgment with respect to Union Carbide; however, the |Mcourt made it clear at the February 2, 2010 hearing that it granted summary judgment in favor of Union Carbide. On February 24, 2010, plaintiffs filed a supplemental and amended response to all of the defendants’ motions for summary judgment, filing into the record Dr. Mark’s affidavit that had been sworn to and notarized on January 21, 2010, and the affidavit of Dr. Philip Perret. These affidavits, plaintiffs insisted, created a genuine issue of material fact as to whether Harris’ exposure to asbestos-containing finishing products manufactured by Georgia-Pacific and National Gypsum Company were substantial contributing factors in the development of his mesothelioma. Georgia-Pacific and Union Carbide moved to strike the affidavits, arguing that since they had been dismissed from the litigation their motions for summary judgment were no longer pending before the court, and unless the court granted plaintiffs’ motion for a new trial at the March 2, 2010 hearing, plaintiffs’ memorandum and the attachments thereto were not properly before the court and should be stricken from the record.
At the start of the March 2 hearing, Georgia-Pacific moved to vacate the February 23, 2010 judgment as it indicated that the dismissal had been made pursuant to Article 1671 and plaintiffs agreed that the judgment should be vacated. The court vacated the February 23, 2010 judgment and then signed orders granting Georgia-Pacific and Union Carbide’s mo *369 tions for summary judgment. Thereafter, the court heard plaintiffs’ motion for a new trial on the granting of the summary judgments in favor of Georgia-Pacific and Union Carbide. Plaintiffs asked the court to consider Dr. Mark’s affidavit and allow the parties to argue whether it created an issue of material fact on causation as to those defendants. The court denied the motion for new trial and refused to consider the late-filed affidavit of Dr. Mark. The court stated that it was convinced its ruling denying plaintiffs’ motion to continue to get a properly signed and notarized affidavit by Dr. Mark at the January 19 hearing was proper. It further expressed its belief that both | ^defendants were entitled to summary judgment because there was no proper evidence of specific causation in the record relating to Georgia-Pacific and Union Carbide on January 19, 2010, the date on which the summary judgment motions were set for hearing. The court further stressed that even if it had considered Dr. Mark’s affidavit, it did not contain a discussion of any dose response that would make these defendants liable, and concluded, therefore, that plaintiffs’ evidence on January 19, 2010 was insufficient to “carry the day” as to Georgia-Pacific and Union Carbide. The court also granted Georgia-Pacific and Union Carbide’s motion to strike plaintiffs’ supplemental memoranda and all supporting documents attached thereto.
On March 9, 2010, the trial court signed another judgment granting Union Carbide’s motion for summary judgment. In the judgment, the court stated that it considered the motion on January 19, 2010, and that in granting the motion, the court considered the motion itself, the memorandum in support thereof, the arguments of counsel, and the rulings and comments of the court set forth at both the January 19, 2010 and February 2, 2010 hearings.
In this appeal, plaintiffs contend that the trial court erred in: (1) illegally granting Union Carbide a dismissal with prejudice under La. C.C.P. art. 1671; (2) granting Union Carbide’s motion for summary judgment, regardless of whether Dr. Mark’s affidavit was considered; (3) failing to afford Dr. Mark’s affidavit any weight; and (4) limiting Dr. Mark’s testimony to anything more than the exclusion of an opinion that a “single thread” of asbestos can cause mesothelioma.
LAW AND DISCUSSION

Dismissal with Prejudice

In their first challenge, plaintiffs contend that the trial court illegally granted Union Carbide a dismissal with prejudice under La. C.C.P. art. 1671. Plaintiffs point to the case of Northshore Regional Medical Center v. Parish of St. Tammany, 96-0717, p. 6 (La.App. 1st Cir.12/20/96), 685 So.2d 614, 617, wherein this court stated that a trial court lacks authority to act on a motion to dismiss without prejudice by dismissing a plaintiffs lawsuit with prejudice. Rather, the court may refuse to grant the dismissal except with prejudice, and if the plaintiff objects to the dismissal with prejudice, the motion to dismiss should be denied, and the case should proceed. Id. Plaintiffs point out that prior to making the motion to dismiss the lawsuit pursuant to Article 1671, they specifically stated that if the court were only inclined to grant a dismissal with prejudice, they would proceed on the motions for summary judgment. However, the record reflects that immediately after defendants moved to dismiss the lawsuit with prejudice, plaintiffs did not specifically object to the dismissal, and the trial court granted the motion.
We believe that the trial court’s February 2, 2010 clarification of its January 19, 2010 ruling as a grant of Union Carbide’s *370 motion for summary judgment, its action in vacating the February 23, 2010 judgment dismissing Georgia-Pacific from the litigation pursuant to Article 1671, and its signing of the order granting summary judgment in favor of Union Carbide makes it clear that the trial court granted Union Carbide’s motion for summary judgment. Thus, any argument regarding the legality of an Article 1671 dismissal is moot.
Plaintiffs argue, nevertheless, the fact that an Article 1671 dismissal was granted at the January 19, 2010 hearing is relevant to this appeal because such pertains to the timing of when the summary judgment was in fact granted. Plaintiffs submit that the motion for summary judgment was not heard or granted at the January 19, 2010 hearing because the trial court dismissed plaintiffs’ claims against Union Carbide on the basis of Article 1671. They assert that when the trial court realized its mistake and tried to recast its earlier ruling dismissing the case under Article 1671 (at either the February 2 or March 2 hearings), Dr. Mark’s |i7causation affidavit was in the record and should have been considered by the trial court prior to actually granting the motion for summary judgment.
We agree that the record reveals that Union Carbide’s motion for summary judgment was not actually heard by the trial court before the court dismissed the lawsuit against Union Carbide on January 19, 2010. However, we find nothing in the transcripts of the later hearings to indicate that Union Carbide’s motion for summary judgment was “heard.” In fact, there was no hearing on the issue raised by Union Carbide’s motion for summary judgment; that is, whether plaintiffs could prove actual exposure to Union Carbide asbestos. Plaintiffs do not contend that the trial court’s failure to hold a hearing on the motion for summary judgment renders the judgment fatally defective. Because we have concluded, infra, that plaintiffs were not required to produce Dr. Mark’s affidavit to defeat Union Carbide’s motion for summary judgment, we pretermit discussion of plaintiffs’ timing argument as it relates to the propriety of the trial court’s granting of summary judgment in favor of Union Carbide.

Summary Judgment Law

A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. Granda v. State Farm Mutual Insurance Company, 2004-2012, p. 4 (La.App. 1st Cir.2/10/06), 935 So.2d 698, 701. Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
Summary judgments are reviewed on appeal de novo. Granda, 2004-2012 at p. 4, 935 So.2d at 701. Thus, this court uses the same criteria as the trial court in determining whether summary judgment is appropriate — whether there is a genuine issue of material fact and whether mover is entitled to judgment as a 11Rmatter of law. Jones v. Estate of Santiago, 2003-1424, p. 5 (La.4/14/04), 870 So.2d 1002, 1006.
On a motion for summary judgment, the initial burden of proof is on the moving party. If, however, the moving party will not bear the burden of proof at trial on the matter before the court, the moving party’s burden of proof on the motion is satisfied by pointing out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, the non-moving party must produce factual support sufficient to establish that it will be able to satisfy its evidentiary *371 burden of proof at trial. Failure to do so shows that there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2). Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. Babin v. Winn-Dixie Louisiana, Inc., 2000-0078, p. 4 (La.6/30/00), 764 So.2d 37, 40; see also La. C.C.P. art. 967(B). Any doubt as to a dispute regarding a genuine issue of material fact must be resolved against granting the motion and in favor of a trial on the merits. Fernandez v. Hebert, 2006-1558, p. 8 (La.App. 1st Cir.5/4/07), 961 So.2d 404, 408, writ denied, 2007-1123 (La.9/21/07), 964 So.2d 333.
A “genuine issue” is a “triable issue,” that is, an issue on which reasonable persons could disagree. If, on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Jones, 2003-1424 at p. 6, 870 So.2d at 1006. In determining whether an issue is genuine, a court should not consider the merits, make credibility determinations, evaluate testimony, or weigh evidence. Fernandez, 2006-1558 at p. 8, 961 So.2d at 408.
A fact is material if it potentially ensures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. Anglin v. Anglin, 2005-1233, p. 5 (La.App. 1st Cir.6/9/06), 938 So.2d 766, 769. Because 119it is the applicable substantive law that determines materiality, whether a particular fact in dispute is “material” for summary judgment purposes can only be seen in light of the substantive law applicable to the case. Dickerson v. Piccadilly Restaurants, Inc., 99-2633, pp. 3-4 (La.App. 1st Cir.12/22/00), 785 So.2d 842, 844.

Burden of Proof in a Mesothelioma Case

In this case, the plaintiffs’ action for damages is based on negligence. In determining whether to impose liability, the standard analysis employed is the duty/risk analysis. In order for a plaintiff to recover and for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element). Rando v. Anco Insulations Inc., 2008-1163, 2008-1169, pp. 26-27 (La.5/22/09), 16 So.3d 1065, 1086.
To prevail in an asbestos case, a plaintiff must show by a preponderance of the evidence, that he was exposed to asbestos from the defendant’s products and that he received an injury that was substantially caused by that exposure. Rando, 2008-1163 at p. 31, 16 So.3d at 1088. Louisiana courts employ a “substantial factor” test to determine whether exposure to a particular asbestos-containing product was a cause-in-fact of a plaintiffs asbestos-related disease. Thus, in an asbestos case, the plaintiff must show he had a significant exposure to the product complained of to the extent that it was a substantial factor in bringing about the injury. Rando, 2008-1163 at p. 35, 16 So.3d at 1091.
12flBecause of the lengthy latency period between exposure to asbestos and manifestation of the disease, cause-in-fact is noted as the “premier hurdle” faced by plaintiffs in asbestos litigation. Rando, *372 2008-1163 at p. 31, 16 So.3d at 1088. Notwithstanding the difficulty of proof involved, a plaintiffs burden of proof against multiple defendants in a long latency case is not relaxed or reduced because of the degree of difficulty that might ensue in proving the contribution of each defendant’s product to the plaintiffs injury. Rando, 2008-1163 at pp. 35-36, 16 So.3d at 1091. When multiple causes of injury are present, a defendant’s conduct is a cause-in-fact if it is a substantial factor generating plaintiffs harm. Rando, 2008-1163 at p. 31, 16 So.3d at 1088.
In Rando, 2008-1163 at p. 35, 16 So.3d at 1091, the supreme court, in addressing the causation problem in asbestos-related disease cases, relied on the reasoning set forth in Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1094 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), an asbestosis case:
[I]t is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel. It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all of the defendants on many occasions. It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury. We think, therefore, that on the basis of strong circumstantial evidence^] the jury could find that each defendant was the cause in fact of some injury to Borel.
The Borel court also stated that “[wjhether the defendant’s conduct was a substantial factor is a question for the jury, unless the court determines that reasonable men could not differ.” Id.
In Rando, the supreme court then noted, that “[b]uilding upon this early observation [in Borel], Louisiana courts have employed a ‘substantial factor’ test to determine whether exposure to a particular asbestos-containing product was a | ⅞, cause-in-fact of a plaintiffs asbestos-related disease.” Rando, 2008-1163 at p. 35, 16 So.3d at 1091. Thus, in an asbestos case, the claimant must show he had significant exposure to the product complained of to the extent that it was a substantial factor in bringing about his injury. Id. Stated differently, the plaintiff must prove, by a preponderance of the evidence that: (1) his exposure to the defendant’s asbestos product was significant, and (2) that this exposure caused or was a substantial factor in bringing about his mesothelioma (or other asbestos-related disease). See Rando, 2008-1163 at p. 38, 16 So.3d at 1092 (ultimately concluding with regard to cause-in-fact that there was “no manifest error in the trial court’s [factual] determination [that] Rando proved by a preponderance of the evidence his exposure to asbestos was significant and [that] this exposure caused his mesothelioma.” (Emphasis added.)). Lastly, the plaintiffs proof in this regard may be by direct or circumstantial evidence.[5] Rando, 2008-1163 at p. 33, 16 So.3d at 1089.
In its motion for summary judgment, Union Carbide asserted that plaintiffs could not meet their burden of establishing legal causation because they had no evi *373 dence that Harris had been exposed to any products containing Union Carbide asbestos, let alone frequent and regular exposure to Union Carbide asbestos, so as to constitute a substantial contributing factor in the development of Harris’ mesothelio-ma. On appeal, Union Carbide argues that the trial court properly granted its motion for summary judgment because plaintiffs are unable to link Union Carbide to Harris’ alleged exposures. At best, they claim, all plaintiffs can show is that Union Carbide was one of multiple suppliers of raw asbestos to Georgia-Pacific and United States Gypsum, but they cannot prove that Union Carbide asbestos was present in the actual joint compound materials that ^Harris used. Union Carbide insists that to establish factual causation, plaintiffs must bring forth affirmative evidence showing that Harris used specific joint compound products at specific times such that it could be determined that the products at issue contained asbestos. Further, it argues, even if plaintiffs could establish-that some of the joint compound materials used by Harris contained asbestos, they must establish that the materials contained Union Carbide Calidria asbestos as opposed to asbestos from other suppliers. However, without being able to identify a particular product at a particular time, Union Carbide submits, it is impossible to establish the asbestos content generally, or specifically, whether the product contained Union Carbide asbestos. Union Carbide further argues that even if plaintiffs could establish that Harris encountered some joint compound materials that contained asbestos, and that some of the specific joint compound materials contained asbestos supplied by Union Carbide, summary judgment would still be warranted because the record contains no evidence to support a conclusion that Union Carbide was a substantial contributing factor with regard to Harris’ mesothelio-ma. In short, Union Carbide posits, it is entitled to summary judgment because plaintiffs cannot link any alleged asbestos exposure Harris may have suffered to Union Carbide in any way, let alone prove time, frequency, dose, or causation.
Plaintiffs contend that the trial court committed legal error in granting summary judgment in favor of Union Carbide on the basis of the lack of medical evidence to establish specific causation because the only issue raised in Union Carbide’s motion for summary judgment was whether there is a factual dispute about frequent and regular exposure to Union Carbide asbestos. They urge that all Union Carbide’s motion did was to challenge their ability to provide some evidence that Harris was exposed to products that contained Union Carbide asbestos with such frequency and regularity as to constitute a substantial | ¡^contributing cause of Harris’ disease. Plaintiffs contend that they offered evidence showing that Union Carbide furnished asbestos to Georgia-Pacific and the manufacturer of Gold Bond finishing products and that Harris was exposed to those finishing products.[6] This evidence, they submit, is sufficient to raise a factual dispute on the exposure issue and to overcome Union Carbide’s motion for summary judgment. Plaintiffs insist that Dr. Mark’s affidavit or other medical opinion *374 evidence was not required to defeat Union Carbide’s motion for summary judgment, as the motion raised no complex medical issues therein, did not raise the issue of medical causation, and in no way suggested that the testimony of an industrial hygienist or other medical professional was necessary to create a factual dispute regarding causation. Thus, plaintiffs posit, summary judgment was inappropriate regardless of whether Dr. Mark’s affidavit is considered.
To prevail at trial, plaintiffs must first demonstrate by a preponderance of the evidence that Harris was exposed to Union Carbide asbestos. Union Carbide’s motion for summary judgment challenged plaintiffs’ ability to demonstrate that Hams had been exposed to Union Carbide asbestos. The evidence submitted by plaintiffs in opposition to the motion showed that Harris and his co-workers used Georgia-Pacific and Gold Bond joint compound products during the sheetrock finishing process. Plaintiffs offered evidence of the timeline during which Harris was exposed to finishing products, 1970-1980, and that during part of that time, Georgia-Pacific’s drywall finishing products contained asbestos. Plaintiffs also offered evidence showing that Harris and his co-workers breathed in dust created during the sheet-rock finishing jobs on which they worked. We believe the ^evidence is sufficient to create a factual dispute as to whether Harris was exposed to and did inhale asbestos-containing drywall finishing products.
Furthermore, we find that plaintiffs’ failure to offer affirmative evidence pinpointing a specific product, at a specific time, and at a specific location, to which Harris had been exposed, does not entitle Union Carbide to summary judgment. Plaintiffs offered evidence showing that: (1) Harris had been exposed to Georgia-Pacific products; (2) Georgia-Pacific’s drywall finishing products contained chrysotile asbestos from the time it began manufacturing them in 1965 through 1977; (3) Union Carbide targeted the joint compound product market for the sale of its Calidria-brand asbestos; and (4) Georgia-Pacific purchased raw asbestos fibers to manufacture its asbestos-containing drywall products from Union Carbide. This evidence is sufficient to create an inference that the Georgia-Pacific products to which Harris had been exposed contained asbestos manufactured by Union Carbide. We find that this evidence is sufficient to create a factual issue as to whether Harris was exposed to Union Carbide asbestos while working as a sheetrock finisher, precluding the entry of summary judgment in favor of Union Carbide on the issue of actual exposure.
Plaintiffs’ remaining burden in a meso-thelioma case is to demonstrate that Harris’ mesothelioma was substantially caused by that exposure. Rando, 2008-1163 at p. 31, 16 So.3d at 1088. In mesothelioma cases, there are firmly established and accepted medical principles regarding causation. Medical science has proven a causal relationship between asbestos exposure and mesothelioma above background levels. Thus, asbestos exposure is a causative factor in producing the disease. McAskill v. American Marine Holding Company, 2007-1445, p. 7 (La.App. 4th Cir.3/4/09), 9 So.3d 264, 268. It is also established that mesothelioma can develop after fairly short exposures to asbestos, and that every “non-trivial” exposure to asbestos contributes to and constitutes a cause of | ^mesothelioma. See Rando, 2008-1163 at p. 35, 16 So.3d at 1091; McAskill, 2007-1145 at pp. 7-8, 9 So.3d at 268. The causal link between asbestos exposure and mesothelioma contraction has been demonstrated to such a high degree of probability, while at the same time, few if any other possible causes have *375 been identified, that a universal causal relationship has been recognized: if one is diagnosed as having mesothelioma and that person was exposed to asbestos, that exposure is recognized to be the cause of the mesothelioma. Torrejon v. Mobil Oil Company, 2003-1426, p. 23 (La.App. 4th Cir.6/2/04), 876 So.2d 877, 892-893, writ denied, 2004-1660 (La.9/24/04), 882 So.2d 1125.
We agree with plaintiffs’ assertion that they were not required to come forward with medical causation evidence to defeat Union Carbide’s motion for summary judgment. Union Carbide’s motion for summary judgment did not dispute whether plaintiffs could establish that Harris’ specific exposures caused his mesothe-lioma and did not raise the complex medical issue of specific causation that was ultimately relied on by the trial court in granting summary judgment. The motion challenged whether plaintiffs could demonstrate that Harris had been exposed to Union Carbide asbestos, and all of the evidence submitted by Union Carbide in support of its motion for summary judgment related to its claim that plaintiffs could not demonstrate that Harris had been exposed to and inhaled or ingested Union Carbide asbestos. Union Carbide did not argue in its motion that plaintiffs did not have expert medical testimony on the medical causation issue or that testimony from additional medical professionals was necessary to establish causation. Union Carbide was well aware that plaintiffs had retained Dr. Mark, a practicing pathologist and Harvard professor who taught classes on asbestos-related lung diseases, as their medical causation expert.[7] It was only after the trial | ^court revealed its inclination to limit Dr. Mark’s testimony at the January 19, 2010 hearing that Union Carbide began to question the plaintiffs’ ability to prove specific medical causation. However, the issue of specific medical causation had not been set forth in Union Carbide’s motion for summary judgment at the time it was considered by the trial court, and we find that the trial court clearly erred in granting summary judgment on an issue not raised in Union Carbide’s motion for summary judgment. See La. C.C.P. art. 966(E) (providing that a “summary judgment shall be rendered or affirmed only as to those issues set forth in the motion under consideration by the court at that time.” (Emphasis added.)).
Whether a particular exposure constitutes a substantial contributing factor in the development of the disease of mesothelioma is a question of fact. While Union Carbide may have made a bare assertion that plaintiffs could not demonstrate that Harris’ exposure to Georgia-Pacific products was a substantial contributing factor in the development of Harris’ disease, Union Carbide offered no evidence to show that the exposures were not medically significant or that there is some “safe” level of exposure to its products that had not been exceeded. Given the universally recognized causal connection between asbestos exposure and mesotheli-oma, coupled with the fact that Union Carbide could not demonstrate that plaintiffs had not retained a medical causation expert, Union Carbide’s unsupported motion did not shift the burden to plaintiffs to demonstrate at the summary judgment stage that the exposures on which they relied were medically significant. See Coleman v. St. Tammany Parish School Board, 2008-1979, 2008-1980, p. 6 (La. App. 1st Cir.5/8/09), 13 So.3d 644, 648 (the *376 burden on the motion for summary judgment does not shift to the non-moving party until the mover has properly supported the motion and carried the initial burden of proof); Pugh v. St. Tammany Parish School Board, 2007-1856, pp. 4-6 (La.App. 1st Cir.8/21/08), 994 So.2d 95, 98-100, writ denied, 2008-2316 (La.11/21/08), 996 So.2d 1113 (it is only after a | ¡^motion for summary judgment has been made and properly supported that the burden shifts to the non-moving party).
We find that the evidence on the motion for summary judgment created a factual dispute as to whether Harris was exposed to, or did inhale or ingest, Union Carbide asbestos while doing sheetrock finishing work. When this evidence is considered in light of the well-established medical and legal principles establishing the causal connection between asbestos exposure and mesothelioma, along with the absence of any evidence indicating that such exposures were medically insignificant, we find that a genuine issue of material fact exists as to whether the exposures were a substantial contributing cause of Harris’ mesothelioma, thereby precluding the entry of summary judgment on that issue.
Lastly, Union Carbide submits that the trial court’s grant of summary judgment is proper because plaintiffs cannot show the existence of a duty and a breach of duty between Harris and Union Carbide, an asbestos supplier. It argues that it had no duty to provide “sophisticated” users/purchasers like Georgia-Pacific and National Gypsum of the dangers of its products and that it had no control over the design, composition, testing, or manufacture of joint compounds of which its asbestos may only have been an ingredient. Thus, Union Carbide insists, as a matter of law, no duty exists between a raw materials distributor, through several levels of sophisticated users, to an ultimate user/purchaser, or employee of the ultimate user/purchaser company.
We find no support in the jurisprudence for this argument. There is an almost universal duty on the part of the defendant in a negligence action to use reasonable care to avoid injury to another. Rando, 2008-1163 at p. 27, 16 So.3d at 1086. Whether Union Carbide breached its basic duty of reasonable care to someone who may have actually been exposed to asbestos manufactured by Union Carbide is a factual question that can only be determined after all of the evidence ^regarding Harris’ exposure and Union Carbide’s conduct in manufacturing its product is adduced. Accordingly, Union Carbide is not entitled to summary judgment on the duty element of plaintiffs’ cause of action.
For the above reasons, and considering all of the evidence submitted in support of and in opposition to the motion for summary judgment, as well as all of the legal bases on which the motion was sought, we find that the trial court erred in granting summary judgment in favor of Union Carbide, and we reverse that judgment and dismissal of Union Carbide from this litigation.
MOTION TO STRIKE
Union Carbide joined in a motion to strike a portion of the testimony of plaintiffs’ expert, Dr. Eugene Mark, filed by Sherwin-Williams. On February 23, 2010, the trial court entered judgment granting Sherwin Williams’ motion to strike, and plaintiffs challenge that ruling in this appeal. In a companion case decided this day, Robertson v. Doug Ashy Building Materials, Inc., 2010-1552 (La.App. 1st Cir.10/4/11), 77 So.3d 339, this court reversed the trial court’s judgment granting Sherwin-Williams’ motion to strike Dr. Mark’s opinion testimony. For the rea *377 sons set forth therein, the February 23, 2010 judgment granting Sherwin-Williams’ motion to strike the opinion testimony of Dr. Mark is reversed.[8]
CONCLUSION
Based on the foregoing, the March 9, 2010 judgment granting summary judgment in favor of Union Carbide Corporation and the February 23, 2010 judgment granting the motion to strike are hereby reversed. The case is remanded to the trial court for further proceedings consistent with this opinion. All costs of this appeal are assessed to defendant/appellee, Union Carbide Corporation.
REVERSED AND REMANDED.
McCLENDON, J., concurs and assigns reasons.

. In two companion cases also rendered this date, plaintiffs separately appealed the court’s granting of summary judgment in favor of Georgia-Pacific (Robertson v. Doug Ashy Building Materials, 2010-1547 (La.App. 1st Cir.10/4/11), 77 So.3d 323) and the court’s granting of Sherwin-Williams’ motion to strike the testimony of its expert and granting of summary judgment in favor of Sherwin-Williams (Robertson v. Doug Ashy Building Materials, 2010-1552 (La.App. 1st Cir.10/4/11), 77 So.3d 339). On December 3, 2010, this court denied the defendants' motion to consolidate the related appeals, but ordered that the appeals be placed on the same docket and assigned to the same panel. Robertson v. Doug Ashy Building Materials, 2010-1552 (La.App. 1st Cir.12/3/10)(unpub-lished action).

. In their motion, plaintiffs urged that if the court determined it could weigh this issue on summary judgment, it had an affidavit from Dr. Eugene Mark stating that Harris’ exposure to Georgia-Pacific and Gold Bond asbestos-containing finishing products each constituted a substantial contributing factor in the development of Harris’ malignant mesothelio-ma.

. The record reflects that the motions were filed by facsimile transmission on January 29, 2010, and the originals were filed into the record on February 2 and 3, 2010.

. A fact established by direct evidence is one which has been testified to by witnesses as having come under the cognizance of their senses. Rando, 2008-1163 at p. 33, 16 So.3d at 1090. Circumstantial evidence, on the other hand, is evidence of one fact or a set of facts, from which the existence of the fact to be determined may reasonably be inferred. Id.

. While plaintiffs claim in brief that the evidence indicates that Harris was also exposed to Gold Bond brand finishing products, which had been manufactured by National Gypsum, and that the evidence further showed that Union Carbide supplied National Gypsum with asbestos, the exhibit referenced was submitted by plaintiffs in response to Sherwin-Williams' motion for summary judgment and does not appear in plaintiffs’ response to Union Carbide's motion for summary judgment. However, Union Carbide has not denied supplying the manufacturer of Gold Bond joint compounds with raw asbestos.

. For a discussion of Dr. Mark’s qualifications and causation opinion, see the companion case decided this day, Robertson v. Doug Ashy Building Materials, Inc. at docket number 2010-1552.

. Based on our ruling, all issues relating to the failure of the trial court to grant a continuance or a new trial so that a properly signed and notarized copy of Dr. Mark’s affidavit could be obtained and considered are moot.